676 A.2d 992

Adel HAGEZ

v.

STATE of Maryland.

No. 387, Sept. Term, 1995.

Court of Special Appeals of Maryland.

May 30, 1996.

Samuel A. Abady (Rubin, Bailin, Ortoli, Abady & Fry, P.C., David N. Mair and Henry L. Saurborn, Jr., on the brief), New York City, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr. Atty. Gen., Baltimore and Marna McLendon, State's Atty. for Howard County, Ellicott City, on the brief), for appellee.

Argued before CATHELL, MURPHY and HOLLANDER, JJ.

HOLLANDER, Judge.

Adel Hagez, appellant, was convicted by a jury in the Circuit Court for Howard County of first degree murder and use of a handgun in the commission of that murder. He received a sentence of life imprisonment for murder and a

three year concurrent sentence for the handgun offense. On appeal, he presents five questions for our review:

I. Whether the trial judge erred by failing to grant Appellant's motions for judgment of acquittal, where the sole evidence in support of the charge of first degree murder was Appellant's fingerprint on a gun never proven to be the murder weapon.

II. Whether the trial judge erred by failing to grant Appellant's motions for judgment of acquittal, where the State failed to offer any evidence that the killing was wilful, deliberate or premeditated, assuming, *arguendo,* that the killing could be attributed to Appellant.

III. Whether the trial judge erred by refusing to recognize spousal immunity for Appellant's wife based on his finding that Maryland Cts. and Jud. Proc.Code § 9–106 gave him discretion to decide whether or not to recognize the privilege.

IV. Whether the trial judge erred by permitting the State, over the Appellant's repeated objections, to call the Appellant's wife to the stand, and repeatedly threaten her with contempt in response to leading questions by which the State's Attorney testified against Appellant.

V. Whether Appellant's conviction must be vacated because the prosecutor engaged in prohibited misconduct by arguing facts in summation never put in evidence, and urging the jury to convict Appellant based on his wife's refusal to testify against him, in clear violation of the trial judge's instructions to the contrary.

For the reasons discussed below, we conclude that appellant was prejudiced by the nature and extent of questions that the State propounded to Ms. Hagez and by the State's closing argument. We shall therefore reverse.

### *Factual Summary*

Twenty-four witnesses testified for the State. The defense did not present any witnesses, however. What follows is a summary of the State's case, in the light most favorable to the State.

On the morning of June 22, 1991, Riad Hijaz was shot and killed in Room 410 of the Holiday Inn in Jessup, Maryland. According to Dr. Donald Wright, Hijaz had been shot six times and died of multiple gunshot wounds, including one to the chest and two to the head. Three of the six wounds revealed stippling, indicating that the shots had been fired from within 18 inches.

Room 410 was registered to Virginia Hagez, a resident of Richmond, Virginia. On March 8, 1991, some three months before the death of Mr. Hijaz, Ms. Hagez and appellant were divorced, ending 21 years of marriage. Both appellant and Ms. Hagez were born in Lebanon.

At the time of the killing, Ms. Hagez and several men who apparently were of Middle East descent were affiliated with "The Mediterranean Chef," a portable food concession stand. The Mediterranean Chef was servicing the Columbia City Fair in Howard County. Ms. Hagez requested two rooms at the Holiday Inn, for herself and her staff. She specifically requested that the two rooms not be near each other, and that no one be informed of her room number. In addition to room 410, which Ms. Hagez occupied, she was assigned room 308.

On the morning of June 22, 1991, Howard County police officers responded to the motel in answer to a call that shots had been fired. At about 9:50 a.m., Officers David Ash and Paul Yodzis responded to Room 410 of the Holiday Inn. When they entered the room, they saw the body of the victim about a foot from the door. The room was hazy with cigarette smoke and gunpowder. Two full cups of coffee were located on a table in the room. On the dresser was a bag with five cans remaining from a six pack of beer. A copper jacket was found on the unmade bed; spent projectiles were found on the floor by the victim's body.

As Howard County Detective Luther Johnson drove onto the motel parking lot, a woman ran out of the entrance toward his vehicle. The woman, who identified herself as Virginia Hagez, was "hysterical" and was "screaming." She told Johnson that someone had been shot in Room 410 and she asked, repeatedly, "Is he dead?"

Officer Victoria Plank also saw Ms. Hagez as she ran from the motel. She described Ms. Hagez as "rather hysterical at the time." Ms. Hagez told Officer Plank that she had asked a man with her group, who was staying in the downstairs room, to assist her with her luggage. When the man arrived, she went to the motel clerk because of a discrepancy in the bill. Upon her return to the room, the man who was supposed to help with the luggage was on the floor and she ran for help. According to Officer Plank, Ms. Hagez "continued to state that there was nothing going on between the two of them. That he had just been there to help with the suitcases."

On the morning of Saturday, June 22, 1991, Detective A.J. Bellido–Deluna was off duty and was working as a security officer at the Columbia Fair. He recalled that, at about 9:00 a.m., a red "Datsun Nissan type vehicle" with Virginia license plates parked behind him. He noticed a man who appeared to be of Arab descent, with a briefcase, exit the car and proceed to the Mediterranean Chef, where two men were setting up. After a brief conversation, the man left. All of the men appeared to be of Arab descent.

Bruno Kujat had a concession stand near the Mediterranean Chef. He was acquainted with a woman he thought was named "Virginia" at the Mediterranean Chef, having seen her at previous festivals. When they chatted the night before, she told Kujat that she was Lebanese and had three workers. On Saturday morning, Kujat talked with the two men who were at the stand. He recalled seeing another man, who carried a briefcase, walk away from the stand that morning.

Bernadette Williams was the receptionist on duty at the front desk of the Holiday Inn at the time of the killing. She testified that, shortly before 9:45 a.m., two men carrying

"money bags" identified themselves as Virginia Hagez's employees from the carnival and asked for Ms. Hagez's room number. According to Williams, Ms. Hagez "kept calling downstairs and saying don't tell them what room I'm in." Williams did not disclose the room number. A third man approached the men and talked to them. Then, all three walked away. Two of the men went outside, but the third one went toward the elevators. Williams did not know if appellant was one of the three men.

Room 415, which was across the hall from Room 410, was occupied at the time by Jerry and Rita Green, who were from North Carolina. At about 9:30 a.m., Mr. Green, who had been in the security business, was in the hall looking for a luggage cart. He noticed a vacuum cleaner leaning up against the door to Room 410. He returned to his room and, about fifteen minutes later, heard the sound of vacuuming, which he thought was unusual given the hour of the day. Then he heard three knocks, followed by a woman saying "oh no." He then heard a single gunshot, followed by four or five shots. He shoved his wife into the bathroom and, unable to dial 911 directly, he called the front desk to report the shooting. Ms. Green also heard the vacuum, the scream and the gunshots, although she did not hear the knocks. After calling for help, they looked out of their door and saw the vacuum cleaner in the hall.

During the investigation, Sergeant Glenn Hansen interviewed Virginia Hagez several times.[1] On June 25, 1991, using information obtained from Ms. Hagez, he directed Montgomery County police to the Shady Grove Metro Station parking lot. There they found a red Nissan with Virginia license plates and parking tickets, dated June 24 and 25, 1991.

---

1. At trial, without objection, evidence was presented that Ms. Hagez had made several statements to the police. But the contents of the statements were not disclosed. In these statements, however, she revealed that appellant stood with a gun at the door of Room 410. As soon as she ran past him, shots were fired and the victim, who obviously was in her room, was killed.

The car was registered to "The Roast Beef Co., Inc.," 2012 Fon-du-lac Road, Richmond, Virginia.

The police obtained a search warrant and seized the vehicle. Documents in the car established appellant's residence at 2012 Fon–du–lac Road in Richmond. Inside the passenger compartment of the Nissan, police found a white bank pouch that appeared blood stained. It contained eleven .38 caliber bullets. In the trunk were two briefcases. The first contained items belonging to Virginia Hagez. The second briefcase held papers that appeared to be bloodstained. Between the papers was a bloodstained revolver with six spent cartridges, four from .38 caliber bullets and two from .357 caliber bullets. The number of spent casings was consistent with the six gunshot wounds to the victim. The gun was a Colt Lawman MK III 357 OTG revolver.

Also found in this briefcase were bloodstained papers, including a letter addressed to appellant, the victim, and another man at 2012 Fon-du-lac Road, Richmond, Virginia. The same address also appeared on other business papers, including a check drawn on the account of "The Roast Beef Company" and signed by appellant.

Appellant's fingerprint was found on the gun. FBI Special Agent J.R. Williamson, a firearms expert, testified, however, that he could not determine if the bullets and bullet fragments recovered from the body of the victim and Room 410 were fired from the gun found in the car, due to insufficient microscopic markings. Nevertheless, he concluded that certain of the bullets and bullet jackets could have been fired from the revolver in issue, based on the specific rifling impressions. He also said that certain of the .38 caliber bullets and the .357 caliber bullets belong to the same "family" of ammunition; Agent Williamson described them as "interchangeable." Moreover, both types of bullets may be fired from a .357 revolver.

Matthew Abbott, a chemist and expert in forensic serology, compared blood samples from appellant, the victim, and the gun. He was not permitted to testify, however, that the blood

on the gun was consistent with the victim's blood, because his conclusion had not been expressly provided in the report furnished to the defense in discovery.

At trial, Ms. Hagez sought to invoke her spousal privilege, which the court rejected. Nevertheless, she refused to testify. Additional facts will be included in our discussion of the issues.

## I.

Appellant advances three reasons for his argument that the evidence presented was insufficient to support his convictions. First, he argues generally that the circumstantial evidence produced by the State did not negate a reasonable hypothesis of innocence. He also argues specifically that the State failed to establish criminal agency and failed to prove the elements of premeditation and unlawful use of a handgun. We disagree. In our view, the evidence was sufficient and the court did not err in denying appellant's motions for judgment.

The test for evaluating evidentiary sufficiency is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994) (quoting *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (emphasis in original). *See also Snyder v. State,* 104 Md.App. 533, 548–49, 657 A.2d 342, *cert. denied,* 340 Md. 216, 665 A.2d 1058 (1995). It is firmly established that "[a] conviction of first degree murder may rest on circumstantial evidence." *Snyder,* 104 Md.App. at 549, 657 A.2d 342.

It has been observed that, "a conviction upon circumstantial evidence alone will not be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence." *Hebron v. State,* 331 Md. 219, 224, 627 A.2d 1029 (1993). *See also Wilson v. State,* 319 Md. 530, 537, 573 A.2d 831 (1990); *West v. State,* 312 Md. 197, 211–12, 539 A.2d 231 (1988). The cases that have repeated that litany

have been understandably vague about what would constitute a case based solely on circumstantial evidence and what would amount to inconsistency with any reasonable hypothesis of innocence. The true test is whether the evidence, circumstantial or otherwise, and the inferences that can reasonably be drawn from the evidence, would be sufficient to convince a rational trier of fact, beyond a reasonable doubt, of the guilt of the accused. *See Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). *See also* discussion in *Finke v. State,* 56 Md.App. 450, 467–478, 468 A.2d 353 (1983), *cert. denied,* 299 Md. 425, 474 A.2d 218, *cert. denied,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984).

The Court of Appeals has explicitly rejected "the premise that circumstantial evidence is in some manner inferior to direct evidence." *Mangum v. State,* 342 Md. 392, 398, 676 A.2d 80, 83 (1996). To the contrary, the Court in *Hebron* reiterated "that there is no difference between direct and circumstantial evidence." *Id.,* 331 Md. at 226, 627 A.2d 1029. *See also In re Daniel S.,* 103 Md.App. 282, 287, 653 A.2d 512 (1995) (" ' "The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred." ' ") (citations omitted). Therefore, a conviction based on a "single strand of circumstantial evidence or successive links of circumstantial evidence," *Id.* 331 Md. at 228, 627 A.2d 1029, may be sustained. Nevertheless, it is the judge's function, not the jury's, to determine whether the evidence is sufficient for the jury's consideration. *Id.,* 331 Md. at 234–235, 627 A.2d 1029.

According to appellant, the State proved only that the victim was shot with a gun, and that a gun with appellant's fingerprint was found in the trunk of a car owned by a company with the same address as his own. He argues that the State's evidence failed to establish that he was the murderer. We are satisfied, however, that there was abundant circumstantial evidence viewed collectively, to support the conviction.

Ms. Hagez was only recently divorced. She insisted that the two rooms that she rented be separated and directed the

desk clerk not to disclose her room number. The jury could infer that the caution exercised by her in arranging her stay at the Holiday Inn indicated that she was fearful and anticipated danger. After the shooting, Ms. Hagez repeatedly asserted to police that there was "nothing going on" between herself and the victim. From these facts, a rational inference could be drawn that Ms. Hagez was afraid of the consequences if her ex-husband found her with another man.

Moreover, shortly before the killing, a man carrying a briefcase was spotted at the concession stand run by Ms. Hagez. A bloodstained gun that could not be excluded as the murder weapon was found in a briefcase in the trunk of a car; the vehicle was clearly tied to appellant. Also, appellant's fingerprint was found on that gun. The gun contained six spent cartridges; the victim died from six gunshots. All of this circumstantial evidence, if believed by the jury, implicated appellant.

■ Appellant contends that, when viewed individually, the various circumstances are not consistent with guilt. For example, he argues that the evidence is insufficient as a matter of law because the State did not negate the possibility that another person could have driven the car from Virginia to Maryland to shoot Mr. Hijaz and that appellant could have left his fingerprint on the gun before the shooting. In essence, he complains that the jury did not draw the inferences that he wished it to draw. The State correctly observes that appellant's "attempt . . . to suggest that individual pieces of evidence are subject to innocent interpretations is a flawed attempt to avoid the damaging impact of the evidence considered as a whole." Moreover, it is the exclusive function of the jury to draw reasonable inferences from proven facts. *McMillian v. State*, 325 Md. 272, 290, 600 A.2d 430 (1992). We cannot say that the jury's inferences were unreasonable.

■ With regard to his conviction for first degree murder, appellant also argues that "there was not a shred of evidence from which the jury could have found the killing was 'wilful, deliberate and premeditated.'" Maryland Code (1957,

1992 Repl.Vol.) Art. 27, § 407 provides that "[a]ll murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree." In order for a killing to be premeditated, "the design to kill must have preceded the killing by an appreciable length of time, that is, time to be deliberate." *Snyder,* 104 Md.App. at 549, 657 A.2d 342 (quoting *Tichnell v. State,* 287 Md. 695, 717–18, 415 A.2d 830 (1980)). Nevertheless, no particular length of time is required to constitute premeditation. *Id.* To the contrary, the length of time is sufficient so long as "the purpose to kill was not 'the immediate offspring of rashness and impetuous temper,' but was the product of a mind 'fully conscious of its own design.'" *Willey v. State,* 328 Md. 126, 133, 613 A.2d 956 (1992) (citing *Gladden v. State,* 273 Md. 383, 387, 330 A.2d 176 (1974) and *Cummings v. State,* 223 Md. 606, 612, 165 A.2d 886 (1960), *cert. denied,* 366 U.S. 922, 81 S.Ct. 1098, 6 L.Ed.2d 243 (1961)).

■ Ordinarily, premeditation is not established by direct evidence. Rather, it is usually inferred from the facts and surrounding circumstances. *Snyder,* 104 Md.App. at 549, 657 A.2d 342; *Traverso v. State,* 83 Md.App. 389, 395, 574 A.2d 923, *cert. denied,* 320 Md. 801, 580 A.2d 219 (1990).

Here, there was ample evidence from which the jury could infer premeditation. Appellant drove from Richmond, Virginia to Columbia, Maryland, hid a gun in his briefcase, searched for the victim in two places—the Columbia Fair and the Holiday Inn—and ran a vacuum cleaner to lure the victim or Virginia Hagez into opening the door to the room. Moreover, three of the six shots were fired from close range. If believed by the jury, this evidence was sufficient to prove the element of premeditation.

Appellant also argues that his fingerprint on the gun does not prove that he used it to commit a felony. The victim died as a result of multiple gunshot wounds and the bloodstained gun on which appellant's fingerprint was found contained six spent cartridges of a caliber consistent with the fatal bullets.

There were no fragments inconsistent with firing from the gun. The jury was entitled to conclude that appellant used the gun found in his briefcase to kill Mr. Hajiz. Moreover, the jury was entitled to find that the revolver found in the briefcase was the murder weapon. *See* Maryland Code (1957, Repl.Vol.1992), Art. 27, § 386 (1995 Cum.Supp.).

## II.

Appellant argues that the trial court committed reversible error in refusing to grant Ms. Hagez immunity from testifying, pursuant to Md.Code, Courts and Judicial Proceedings Art. ("C.J.") § 9–106 (1974, 1995 Repl.Vol.), because she was, at the time of trial, appellant's wife.[2] At the relevant time, C.J. 9–106 provided that "[t]he spouse of a person on trial for a crime may not be compelled to testify as an adverse witness unless the charge involves the abuse of a child under 18."[3] At the outset, we note that the trial court interpreted the statutory phrase "may not" in C.J. § 9–106 as granting him discretion to compel Ms. Hagez to testify. To support its conclusion, the court relied on an earlier version of the statutory privilege, which contained the term "shall." But the phrase "may not" does not seem to permit the exercise of judicial discretion. Article 1, § 26 of the Annotated Code of Maryland says:

> In this Code and any rule, regulation, or directive adopted under it, the phrase 'may not' or phrases of like import have a mandatory negative effect and establish a prohibition.

At the hearing on Ms. Hagez's motion to invoke her spousal immunity privilege, the State disputed that appellant and Ms. Hagez were actually married. While it is undisputed that the

---

**2.** We focus here on the privilege against adverse spousal testimony, and not the privilege that applies to confidential spousal communications that is embodied in C.J. § 9–105. We observe that the privileges embodied in C.J. §§ 9–105 and 9–106 are both referred to as marital privileges.

**3.** Section 9–106 has since been amended to include exceptions that are not relevant here.

couple was divorced in 1991, the trial court heard conflicting evidence regarding the status of the marriage as of the time of appellant's trial.

Ms. Hagez and her brother, Bill Durham, both testified that a remarriage occurred on Friday, April 30, 1993, which was just before commencement of the trial on May 3, 1993. At the time, Ms. Hagez was being held as a material witness at the Howard County Detention Center. Ms. Hagez's brother conceded that he was not present for the alleged marriage ceremony. Although he went to the Detention Center, he said that only a Moslem Druze priest and Mr. Hagez were allowed to see Ms. Hagez. As he was not with them, he could not hear their conversation. Nevertheless, he claimed to be a witness to the marriage, because he was nearby and he signed the religious marriage document. The clergyman who performed the marriage, Imam Bashar Arafat, did not testify.

James Rawlins, Director of the Howard County Detention Center, testified that he was informed that four men, one in Arab dress, came to the Detention Center on April 30th, 1993, but Ms. Hagez had been transported to Circuit Court and was not at the Detention Center when they arrived. Thus, the visitors were unable to see her. He added that the records of the Detention Center did not reflect that appellant or anyone else visited Ms. Hagez on April 30, 1993.

Testimonial and documentary evidence from the Howard County Sheriff's Department did not indicate that Ms. Hagez was visited by appellant or anyone else while she was at the courthouse on April 30, 1993. Additionally, the marriage certificate, which was entered as an exhibit, apparently did not contain the correct address of the Detention Center.[4]

Initially, the trial judge did not think it was necessary for the defense to present any testimony concerning the validity

4. We were unable to locate the marriage certificate in the record, although it was offered in evidence. However, the parties seem to agree that it indicates the marriage occurred at 7900 Washington Boulevard. Rawlins testified that the address of the Detention Center is actually 7301 Waterloo Road in Jessup.

of the marriage, because he did not believe resolution of the privilege issue necessarily turned on whether the parties had actually remarried. Instead, the court was of the view that Ms. Hagez was not entitled to invoke the spousal privilege because, in his view, "the marriage was entered into ... the purpose of the marriage was to hinder justice by preventing Mrs. Hagez's testimony if asserted." The following colloquy is relevant.

[DEFENSE COUNSEL]: Your Honor is there any question in the Court's mind as to whether or not Mrs. Hagez was married?

THE COURT: Well my point is [defense counsel] for the sake of this request your [sic] making or motion whatever you want to call it for the sake of that I'm going to assume that she was married.

[DEFENSE COUNSEL]: Fine thank you. I just wanted to know whether to direct my comments to the question of whether or not a marriage existed.

THE COURT: I'm going to assume she was married.

[PROSECUTOR]: But Your Honor just so that the record is clear the Court is not finding as a matter of fact that you believe that she was married?

THE COURT: No I said for this motion. I'm making an assumption that she was.

[PROSECUTOR]: I just want to clarify. Thank you Your Honor.

THE COURT: No I'm not making a decision whether she was or wasn't. For this motion I'm going to assume that she was.

Ultimately, when pressed, the trial court found that appellant and Ms. Hagez had remarried prior to the trial.

[PROSECUTOR]: And again just one other matter for the sake of the record the Court still has not ruled that in fact there was a marriage. You are still ruling that you ...

THE COURT: Alright I'll rule there was a marriage. I don't see where that has anything to do with this motion. I don't know. I'll rule that there was. Does it make any difference?

[PROSECUTOR]: Your Honor I think just for the sake of the record I would argue to the Court and again this is just for the sake of the record I would argue to the Court that there could not have been a marriage. That the State has produced evidence that there wasn't a meeting between Mrs. Hagez and Adel Hagez to affect this marriage that is claimed and I would argue that the fact of the marriage has not been proved therefore the exception is not—there is no exception—there is no privilege in this case.

THE COURT: Okay. I find a state of even balance I'll rule that there was a marriage.

Later, the court said:

[A]s to the marriage I'm going to say for the ruling of this that looking at it in a light lets [sic] say most favorable to Mrs. Hagez I'm going to say that there was a marriage. . . .

The State argues, *inter alia,* that the court correctly determined that a remarriage, undertaken for the deliberate purpose of impeding justice, may properly preclude the exercise, in Maryland, of the spousal privilege. The State also contends that no harm occurred, even if the court erred in refusing to recognize Ms. Hagez's privilege, because Ms. Hagez never answered the State's questions. Moreover, the State suggests that the court did not err, because the court was not satisfied that the State had met its burden of persuasion in establishing a valid remarriage. In this regard, the State relies on the court's remark that his mind was in a state of "even balance."

In our view, the court's "even balance" comment was an interjection that did not vitiate the court's conclusion that the parties had, indeed, remarried.[5] Moreover, even if the court erred in regard to its ruling concerning the spousal privilege, the State is correct that Ms. Hagez steadfastly

---

5. We recognize that spousal testimonial immunity, authorized by C.J. § 9–106, is a privilege of spouses; it can be invoked in a criminal case only by a husband or wife. Either Ms. Hagez or appellant had the burden to prove, by a preponderance of the evidence, that the parties were married at the time of trial. *Cf. Kassap v. Seitz,* 315 Md. 155, 161–62, 553 A.2d 714 (1989) ("It is well established that the broad

refused to testify. Although the State was permitted, at length, to question Ms. Hagez, she consistently asserted the spousal privilege and only testified to her address. Therefore, the State was never able to compel Ms. Hagez's testimony.

The question, then, is whether the statutory testimonial privilege is available to a witness who has married solely to assert the spousal testimonial privilege or to obstruct justice. The trial judge refused to permit Ms. Hagez to assert the marital privilege, because it determined "that the purpose of the marriage was to hinder justice by preventing Mrs. Hagez's testimony...." [6]

"The marital privilege is one that remains vital in modern jurisprudence...." *United States v. Morris*, 988 F.2d 1335, 1339 (4th Cir.1993). In *Trammel v. United States*, 445 U.S. 40, 48, 100 S.Ct. 906, 911–12, 63 L.Ed.2d 186 (1980), the Supreme Court recognized the important policy concerns that are central to the marital privilege and said that "the long history of the privilege suggests that it ought not to be casually set aside." Nevertheless, we need not resolve the thorny issue concerning the availability of the privilege, in light of our decision to reverse on other grounds.[7] We observe that, on remand, the parties may present other evidence concerning the status of the Hagez marriage. More-

---

concept of 'burden of proof' consists of at least two component parts: the burden of production (also referred to as the duty of going forward with the evidence) and the burden of persuasion.").

**6.** Ms. Hagez's own attorney acknowledged that "the more sensible view of it is she wants to get out of jail."

**7.** We note that the spousal privilege, codified in C.J. § 9–106, does not seem to include any exceptions concerning an improper motive or purpose in marrying. Rather, it appears to pertain to anyone who qualifies as a "spouse," without regard to the motive for the marriage. Thus, one who marries for money, or to enhance one's career, or for estate purposes, seemingly would be entitled to invoke the privilege, so long as the marriage is valid; the statute does not specifically authorize a trial court to go behind the marriage to discern its validity or to pass judgment on the reasons for the marriage.

In *Coleman v. State*, 281 Md. 538, 380 A.2d 49 (1977), which construed C.J. § 9–105, the parties were separated at the time of their

over, the trial court should make clear findings concerning the parties' marital status.

## III.

It is appellant's final points with which we are principally concerned. Appellant argues that the trial court erred in

---

confidential communication. Nevertheless, the Court said, "[a]bsent a statutory provision to the contrary, application of the privilege does not depend upon the stability of the marriage, either at the time of the communication or at the time the privilege is asserted." *Id.*, 281 Md. at 544, 380 A.2d 49. Moreover, the Court added:

> It may be ... that where there is no actual marital relationship to preserve and protect, that public policy dictates not permitting the privilege to become an obstruction to the administration of justice. That argument, quite obviously, should be addressed to the legislature, not the courts.

*Id.*, 281 Md. at 545, 380 A.2d 49. *See also State v. Enriquez,* 327 Md. 365, 373, 609 A.2d 343 (1992) (in construing C.J. § 9–105, the Court refused judicially to create exceptions to the confidential marital communications privilege that were not expressly authorized or created by the Legislature).

On the other hand, in *Lutwak v. United States,* 344 U.S. 604, 615, 73 S.Ct. 481, 488, 97 L.Ed. 593 (1953), which involved the federal War Brides Act, the Supreme Court considered the common law spousal privilege and said: "In a sham, phony, empty ceremony such as the parties went through in this case, the reason for the rule disqualifying a spouse from giving testimony disappears, and with it the rule." *See also United States v. Mathis,* 559 F.2d 294, 298 (5th Cir.1977) (In a remarriage, "[i]t is well established that an exception to the husband-wife privilege exists if the trial judge determines that the marriage is a fraud"); *United States v. Apodaca,* 522 F.2d 568, 571 (10th Cir.1975) (holding that appellant could not avail himself of spousal privilege "because it is based upon a fraudulent, spurious marriage that was not entered into in good faith").

In *Osborne v. State,* 623 P.2d 784 (Alaska 1981), after noting the "coincidence in timing between [defendant's] upcoming trials and the wedding. . . ." and that compulsory testimony "is the basic norm of our legal system," the court said:

> [T]he circumstances under which the marriage was entered into permit an inference that the purpose of the marriage was to hinder justice, by preventing [the wife's] testimony. Neither the trial court nor we are required to ignore this reality. . . . An eve-of-trial marriage, entered into when there is a strong motivation by one party to prevent the testimony of the other, should not be encouraged. It exalts form over substance, and it asks us to blind ourselves to the probable underlying motivation for the marriage ... We hold that the trial court correctly denied to Osborne the protection afforded by the privilege against adverse spousal testimony.

permitting the State: 1) to force Ms. Hagez to invoke the spousal privilege in front of the jury; 2) to persist in asking Ms. Hagez leading questions; and 3) to refer to Ms. Hagez's silence during closing argument. The State counters that the court did not err in forcing Ms. Hagez to assert the privilege before the jury, or in allowing the State to question her, because she improperly invoked the spousal privilege and thus had no right to refuse to answer the questions. In addition, the State contends that no harm occurred because Ms. Hagez never actually testified and the Court instructed the jury that it could not draw any inferences from Ms. Hagez's refusal to testify. Finally, the State asserts that appellant's contentions as to closing argument are not preserved.

### A.

Appellant contends that the court erred in permitting the State to continue to pose questions to Ms. Hagez, when it knew she would invoke, albeit improperly, a testimonial privilege. This issue would be less thorny if Ms. Hagez were entitled to assert her spousal privilege. In resolving this issue, we shall, assume that the court correctly determined that the spousal privilege was not available to Ms. Hagez. Under this circumstance, the question of error is more problematic. In analyzing this issue, we note that the parties have not provided us with any authority that is directly on point.

The case of *Adkins v. State,* 316 Md. 1, 557 A.2d 203 (1989) is somewhat instructive. There, appellant was convicted of felony murder. The Court considered whether it was proper to permit the State to call an accomplice witness before the jury, although the State knew the witness would assert his privilege against compelled self-incrimination. Appellant argued that, as a result, his defense was prejudiced. The State claimed, however, that it was entitled to call the witness in order to establish unavailability as a foundation for certain

---

*Id.,* 623 P.2d at 787.

hearsay evidence. The Court concluded that the procedure constituted prejudicial error and reversed. *Id.,* 316 Md. at 16, 557 A.2d 203.

The accomplice witness first invoked his privilege at an evidentiary hearing, at which he asserted his refusal to testify because his own case was pending on appeal. Although he was found in contempt and sentenced to six months' imprisonment, he persisted in his refusal to testify. Nevertheless, the trial judge permitted the State to call the witness before the jury, thereby forcing him to invoke his Fifth Amendment privilege in response to questions propounded to him. After he refused to answer, the court advised the witness that he had no right to decline to answer and again found him in contempt.

Relying on *Vandegrift v. State,* 237 Md. 305, 206 A.2d 250 (1965), the Court set forth five factors to be considered in resolving a claim of error stemming from the State's decision to call before a jury a witness who it knows will invoke a Fifth Amendment privilege. These factors are:

1. That the witness appears to have been so closely implicated in the defendant's alleged criminal activities that the invocation by the witness of a claim of privilege when asked a relevant question intending to establish the offense charged will create an inference of the witness' complicity, which will, in turn, prejudice the defendant in the eyes of the jury;

2. That the prosecutor knew in advance or had reason to anticipate that the witness would claim his privilege, or had no reasonable basis for expecting him to waive it, and therefore, called him in bad faith and for an improper purpose;

3. That the witness had the right to invoke his privilege;

4. That defense counsel made timely objection and took exception to the prosecutor's misconduct; and

5. That the trial court refused to fail to cure the error by an appropriate instruction or admonition to the jury.

*Adkins*, 316 Md. at 12–13, 557 A.2d 203.

In *Vandegrift*, appellant was convicted of assault and battery after a trial at which several co-defendants, who had not yet been tried, were called to the stand by the State, although the prosecutor knew the co-defendants would invoke their Fifth Amendment privilege. In its questions, the State asked about matters related to the crime with which appellant was charged. The Court held that the jury was potentially prejudiced because it was permitted to hear the alleged accomplices assert their testimonial privilege in front of the jury. While the Court indicated that a prosecutor is not necessarily precluded from calling a witness he knows will refuse to testify, the Court suggested the State may not call a witness for the sole purpose of creating an improper inference in the minds of the jurors. The Court said: "The test is whether the State's Attorney calls the witness for the effect of the claim of privilege on the jury." *Vandegrift*, 237 Md. at 309, 206 A.2d 250.

Nonetheless, the Court in *Adkins* said that the "*Vandegrift* factors serve [only] as guidelines to assess the overall circumstances of the invocation of the privilege." *Id.*, 316 Md. at 13, 557 A.2d 203. Therefore, a defendant need not establish all five factors to support a claim of error. *See also Allen v. State*, 318 Md. 166, 174–179, 567 A.2d 118 (1989) (under most circumstances, it is improper to call a witness before a jury, knowing the witness will invoke the Fifth Amendment privilege, when the purpose is for the effect of requiring the assertion of privilege in the jury's presence).

The case of *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), a federal wagering tax law case, also provides some guidance to us. There, the Supreme Court did not find reversible error based on the prosecutor's effort to question witnesses before the jury, knowing of their claims of a Fifth Amendment privilege, because there was no prosecutorial misconduct and the defendant was not unfairly preju-

diced. The Court observed that the witnesses held privileged as well as nonprivileged information and they did offer some testimony at trial. As to one of the witnesses, the Court said, "In the course of eliciting this and other relevant testimony, the prosecutor asked only four questions held to be privileged." *Id.*, 373 U.S. at 189, 83 S.Ct. at 1156. Further, the Court found that the "effect of these questions was minimized by the lengthy nonprivileged testimony" of the witnesses. *Id.*, 373 U.S. at 189, 83 S.Ct. at 1156. It also considered that the defense counsel either failed to object or acquiesced to the procedure.

The Court recognized, however, that, based on the "surrounding circumstances" of a particular case, *Id.*, 373 U.S. at 186, 83 S.Ct. at 1154, error may result. In particular, it referred to two factors, both of which are relevant here: 1) "When the government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," and 2) where "inferences from a witness' refusal to answer [add] critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." 373 U.S. at 186–87, 83 S.Ct. at 1155.

Another federal case, *United States v. Morris*, 988 F.2d 1335 (4th Cir.1993), is also helpful. There, the Court considered the practice of "cross-examining before a petit jury a defense witness-wife about her invocation of the marital privilege before the grand jury...." *Id.*, 988 F.2d at 1339. The trial court had permitted the inquiry as relevant to bias and credibility. But the Fourth Circuit held that the trial court committed reversible error by permitting the prosecutor to question the defendant's wife, on cross-examination, about her earlier invocation of marital privilege.

In *Morris*, the witness-wife waived her spousal privilege at trial, in order to testify for her husband. To some extent, then, her position is comparable to that Ms. Hagez, for whom the court below found the privilege inapplicable. Whether by volition or a court order, neither Ms. Morris nor Ms. Hagez

had a spousal privilege at the time of trial. The Court in *Morris* observed:

> The wife's silence [by asserting the privilege] may cause the jury to believe that she was silent to protect her husband and is lying at trial to protect him further. Indeed, the avowed purpose of introducing the assertion of the privilege was to question [the wife's] credibility, and it is self-evident that marital silence offers the same protection as does Fifth Amendment silence.

*Id.*, 988 F.2d at 1339–40. Because the wife's testimony and her credibility were crucial to the defense, the Court determined that the error was not harmless.

■ We recognize that these cases are readily distinguishable. For example, in each case, the privilege was properly asserted. Moreover, the witnesses in *Adkins, Vandegrift,* and *Namet* relied on a constitutional privilege, not a statutory one. Nonetheless, the reasoning of the courts persuades us that reversible error occurred here. We explain.

Without question, the prosecutor here knew that Ms. Hagez intended to assert a marital privilege. Outside the presence of the jury, the court questioned Ms. Hagez, under oath. The following colloquy is relevant:

> THE COURT: Now Mrs. Hagez I am compelling you to testify. Now in the event you do not testify you could be found in contempt of Court and once found in contempt of Court I can send you to jail do you understand that ma'am?
>
> MS. HAGEZ: Yes I do.
>
> THE COURT: Alright knowing that and I'm telling you if you do not testify you will be found in contempt of Court. You will be serving a lot more jail time. Do you understand that ma'am?
>
> MS. HAGEZ: I understand. I would like to appeal it if I can.
>
> THE COURT: Oh I understand but do you understand what I'm saying to you?
>
> MS. HAGEZ: Yes I do understand.

THE COURT: And in light of that are you going to testify?

MS. HAGEZ: No, I'm not going to testify.

After the court advised Ms. Hagez that he was compelling her to testify and that he would find her in contempt if she refused to testify, the prosecutor asked the court for an opportunity to question Ms. Hagez before the jury. It sought to pose questions "on a question by question basis . . .", to which the defense objected. The State also claimed that it was "certain" that there would be "many questions" that the witness would answer truthfully, concerning such matters as her business, the Columbia Fair, her children and the state of her marriage. It also argued that "We don't know [if she will refuse to answer] until she says."

Thereafter, the judge ruled that the State could question Ms. Hagez in front of the jury. It also determined to require Ms. Hagez to assert her privilege after each question. We need not dwell on the propriety of these decisions, however, because our focus is on the nature and extent of the actual questioning.

While the prosecutor may have justifiably believed, at the outset, that Ms. Hagez might ultimately yield to the court's order and answer the State's questions, it was soon readily apparent that Ms. Hagez would not capitulate. Indeed, she remained steadfast and determined in her refusal to answer any questions. Nevertheless, the State continued to propound questions to Ms. Hagez. Further, as the record makes clear, the State exceeded in scope the type of questions that it earlier suggested to the court Ms. Hagez might be inclined to answer.

Moreover, the questions continued even though counsel for Ms. Hagez reiterated to the Court that Ms. Hagez would not testify. Counsel said: "Your Honor I would like to advise the Court Mrs. Hagez has told me that she intends to refuse to answer any questions. Rather then [sic] proceed question after question after question I thought I would advise the Court of that and in the presence of the jury so they know what is going on." Immediately thereafter, defense counsel

said: "Your Honor I would also object to the procedure because depending on how far you allow [the prosecutor] to go it constitutes prosecutors testifying by asking questions did you do this[?] Did you do that[?] knowing that the witness will refuse to answer which certainly creates great prejudice in the minds of the jury."

Nonetheless, in the presence of the jury, the court again ordered the witness to respond to the questions, reminded her that she was subject to contempt for her failure to respond, and told her that she could be sent to jail. Undaunted, Ms. Hagez again asserted her right not to testify. Still, the questions continued.

At yet another bench conference, defense counsel asked the court, "Your Honor how long will the Court permit [the prosecutor] to continue testifying?" The Court acknowledged the problem with the form of the State's questions when it said "Yeah you're getting your testimony in aren't you? . . . But you're asking leading questions to begin with. Answer yes or no. . . . She has indicated she is not going to answer any questions." The prosecutor's response is telling: "I understand that Your Honor. However, at this point for the purpose of the record I think the State should be permitted to ask certain questions. For her to assert the privilege that the Court has ruled she does not have." Understandably, the defense attorney vigorously objected, characterizing the State's position as "outrageous." He said, "This is not for purposes of the record. This is for purposes of the jury's information." In the face of this exchange, the court nonetheless decided to "allow [the State] to ask a couple more [questions]. . . ." As we see it, even if Ms. Hagez did not validly assert a privilege, the court "should have been conscious of the potential hazards of continued questioning." *Allen v. State, supra,* 318 Md. at 181, 567 A.2d 118.

The following questions exemplify those propounded by the prosecutor:

**220**

PROSECUTOR: Mrs. Hagez do you recall seeing an individual lying shot in your room at the Holiday Inn?

 \* \* \* \* \* \*

PROSECUTOR: Mrs. Hagez I show you a photograph that has been accepted as State's Exhibit 5 of Room 410. I would ask you to take a look at that photograph Mrs. Hagez. Do you recognize the individual in that photograph?

 \* \* \* \* \* \*

PROSECUTOR: Mrs. Hagez do you recall making statements to members of the Howard County Police Department regarding what happened on June 22, 1991 at the Holiday Inn, Room 410?

 \* \* \* \* \* \*

PROSECUTOR: Mrs. Hagez do you recall running outside the Holiday Inn screaming hysterical making certain statements to Officer Plank a female officer with the Howard County Police and Officer Luther Johnson a black officer with the Howard County Police?

 \* \* \* \* \* \*

PROSECUTOR: Mrs. Hagez do you remember telling Officer Plank that you were not having an affair with the man?

 \* \* \* \* \* \*

PROSECUTOR: Mrs. Hagez do you remember after the shooting coming back to Columbia, Maryland or specifically Ellicott City, Maryland and meeting with Detective Glenn Hansen to retrieve some documents from your briefcase?

Perhaps the most disturbing question is the one that follows:

PROSECUTOR: Mrs. Hagez do you recall on your statements to Howard County Police Officers identifying . . . identifying to members of the Howard County Police Department who you saw outside your door with a gun?

The jury knew that Ms. Hagez claimed she was appellant's spouse. Therefore, the preceding question is akin to a prosecutor asking Marina Oswald if she had told the police that she saw her husband in possession of a rifle at the Texas School

Book Depository on November 22, 1963. The question itself is damning; the answer is almost irrelevant.[8]

In this circumstantial case, in which not a single eyewitness identified appellant as the murderer and the physical evidence although sufficient, was not compelling, the significance of Ms. Hagez's refusal to answer the State's questions cannot be overlooked. The jury knew that Ms. Hagez claimed she was appellant's wife. It was also aware that she was at the scene of the murder. Surely, the jury would have inferred that Ms. Hagez knew who committed the murder and that, if Ms. Hagez's testimony would have exonerated appellant, she would not have sought to invoke her marital privilege. Justice Black's comment in his dissent in *Namet* seems apt here: "Certainly the prosecutor must have thought the refusals to answer would help the State's case; otherwise, he would not

---

8. In *Tyler v. State*, 105 Md.App. 495, 660 A.2d 986, *cert. granted*, 340 Md. 650, 667 A.2d 897 (1995) we focused, *inter alia*, on Md. Rule 5–802.1 and *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993) in connection with a contemptuous codefendant, Gerald Eiland, who refused to testify at Tyler's trial after Eiland's earlier acquittal. Writing for the majority, Judge Moylan pointed out that appellant never actually sought to question Eiland, notwithstanding that he had refused to answer almost all of the State's questions. *Id.*, 105 Md.App. at 543, 660 A.2d 986. Judge Moylan noted that, based on the questions the defense could have posed, it would have been able to diminish the damage from the admission in evidence of Eiland's testimony from his own trial, in which he said that Tyler shot the victim. Indeed, the majority acknowledged the potentially powerful nature of precisely the kind of questions the State asked in this case. Judge Moylan said: "A question to Eiland [by the defense] such as 'Is it not true that you lied in your earlier trial testimony and placed the blame on Tyler simply to save yourself?' followed by a response of 'I can't answer that question,' would have had a significant impact in casting doubt on that earlier testimony. A series of ... such questions and responses ... might have blown Eiland's earlier trial testimony right out the window." *Id.*

The case of *United States v. Hearst*, 563 F.2d 1331 (9th Cir.1977), cited by the Court in *Tyler*, is not on point here. There, the Court concluded that when a defendant has voluntarily waived a Fifth Amendment privilege by electing to testify, "the rationale for prohibiting privilege—invoking queries on cross-examination does not apply." *Id.*, 563 F.2d at 1341. Therefore, the Court said that the government was entitled to attempt to question the defendant, though its questions culminated in "42 assertions of the Fifth Amendment." *Id.*, 563 F.2d at 1342.

have asked the questions that he knew would not be answered." *Id.,* 373 U.S. at 191, 83 S.Ct. at 1157.

We conclude that Ms. Hagez's repeated refusal to answer clearly provided "critical weight" to the State's case. The State sought to seize on the opportunity afforded to it by Ms. Hagez's silence; through its leading, testimonial questions, it attempted to place before the jury evidence that it was otherwise unable to present and to construct its case from inferences derived from its own questions. As the Court said in *Morris,* "The inference that a wife remained silent ... because she knew information that would inculpate her husband is one the jury is likely to draw. The Government must not be allowed to try its case by the use of improper inferences." *Id.,* 988 F.2d at 1340.

Based on the circumstances of this case, we do not believe it is dispositive that Ms. Hagez may not have been entitled to assert the spousal privilege or that the privilege was not a constitutional one. *See United States v. MacCloskey,* 682 F.2d 468, 478 n. 19 (4th Cir.1982) ("We think that the best procedure to follow after a witness has *improperly* invoked the Fifth Amendment *or any privilege* in such a situation, is to issue an order, outside of the jury's presence, directing him to testify and admonishing him that his continued refusal to testify would be punishable by contempt.") (Emphasis added). The State's questions were tantamount to prosecutorial testimony. Moreover, the State's unrelenting effort to question Ms. Hagez, notwithstanding her refusal to testify, prejudiced appellant. We cannot blind ourselves to the actions of the prosecutor, who persistently sought to question Ms. Hagez, even though she may have improperly invoked her testimonial privilege.

The words of Judge Moylan, writing for the Court in *Zemo v. State,* 101 Md.App. 303, 306, 646 A.2d 1050 (1994), albeit in a different context, seem particularly apt here:

A few smudges of prejudice here and there can be found almost universally in any trial and need to be assessed with a cool eye and realistic balance rather than with the fastidi-

ous over-sensitivity or feigned horror that sometimes characterizes defense protestations at every angry glance. We are not talking about the expected cuts and bruises of combat. What we are objecting to in this case, rather, is a sustained and deliberate line of inquiry that can have had no other purpose than to put before the jury an entire body of information that was none of the jury's business. We are not talking about a few allusive references or testimonial lapses that may technically have been improper. We are talking about the central thrust of an entire line of inquiry. There is a qualitative difference. Where we might be inclined to overlook an arguably ill-advised random skirmish, we are not disposed to overlook a sustained campaign.

### B.

Appellant also asserts that, in closing argument, the prosecutor improperly urged the jury to convict appellant by relying on the import of Ms. Hagez's refusal to testify. The State's primary response is that this issue is not preserved. We find no merit in the State's contention, but we find merit in appellant's claim.

In its closing argument, the State specifically commented on Ms. Hagez's silence, although the trial court had earlier instructed the jury that Ms. Hagez's "refusal to answer questions is not evidence and you may not draw any inferences from it and any inferences from her refusal to answer questions." Indeed, out of an abundance of caution, the court reiterated to the jury that her refusal to testify was not evidence, no inferences could be drawn from the refusal and that the jury was not permitted to "speculate on what her testimony might have been." [9] Yet the State disregarded the court's instructions and tried to capitalize on the situation it created. The prosecutor argued:

---

9. We observe that Ms. Hagez was questioned on May 7, 1993 and the court did not so instruct the jury until May 10, 1993.

[PROSECUTOR]: You heard that Virginia Hagez ran out of the Holiday Inn hysterical, dry heaves, screaming, crying, she was upset, and isn't it interesting what information she gave to the police officers as she ran out of the Holiday Inn. A man was shot in her room. They weren't having an affair. I believe I will submit to you ladies and gentlemen that those words are very telling of what happened on June 22nd, 1991. A man was shot in my room. We weren't having an affair. What an odd thing for her to say. *Did she come forward on Friday of last week to relate to you that she said those statements to the members of the Howard County Police Department.*

DEFENSE COUNSEL: Objection.

THE COURT: I'll allow it. Go ahead.

[PROSECUTOR]: *[Ms. Hagez] was asked to take the stand. The state asked over twenty questions of her.* The first question was how long have you lived in Richmond. *Now my question is not evidence.* The question that I asked of her how long have you lived in Richmond should not suggest anything to you. It is just a question, but from the very beginning she refused to answer my questions. *There were many other questions not related to the events of June 22nd, 1991 and again the Court has instructed you that you were not to consider my questions as evidence, but when asked those questions Mrs. Hagez refused to answer.* There were three people in that room Riad Hijaz, Virginia Hagez and I submit to you the defendant. Riad cannot speak to you and Virginia would not. *You may consider why Virginia Hagez would not speak to you.* She was a witness called upon by the state. The Court has given you a credibility of witness instruction and in that credibility of witness instruction he instructed you that you may consider motive to lie, bias[,] any of those things that all of us as ordinary citizens would consider in our daily lives when relating to individuals. *So while you may not consider the questions that I asked of Virginia Hagez I suggest to you*

*you may consider her reason for not answering my questions.*

(Italics and boldface supplied).

 It is readily apparent that the defense objected to the prosecutor's argument regarding Ms. Hagez's silence, but the objection was overruled. When the State proceeded, the defense did not renew its objection. It would have been pointless to do so, however, because the judge had just said that he would allow such argument. We are satisfied, under these circumstances, that the issue has been preserved for our review. " 'As we see it, requiring [appellant] to make yet another objection' " immediately after the court's ruling, on the same ground, " 'would be to exalt form over substance.' " *Dyce v. State,* 85 Md.App. 193, 197, 582 A.2d 582 (1990) (quoting *Watson v. State,* 311 Md. 370, 372 n. 1, 535 A.2d 455 (1988)). Therefore, we shall consider the merits of appellant's claim.

The case of *Mouzone v. State,* a homicide case, 33 Md.App. 201, 364 A.2d 58 (1976), provides some guidance. There, the Court considered whether the appellant was denied due process of law based on the prosecutor's conduct in intentionally introducing and emphasizing "irrelevant and incompetent evidence" through his "comments and questions to witnesses." James Harrison, the State's only material witness, identified appellant as the individual who shot the victim. During its opening statement, in closing argument, and in the course of direct and cross-examination, the prosecutor made inflammatory remarks or posed improper questions. Although defense counsel objected once during closing argument, he did not renew his objection following the prosecutor's continued improper comments. While the Court determined to review only those matters to which objections were lodged, it acknowledged, "That the prosecutor's actions complained of were exceedingly improper and calculated to unfairly prejudice the jury against the appellant is scarcely a matter for argument." *Id.,* 33 Md.App. at 209, 364 A.2d 58. It added, however, that " 'unless it appears that the jury were actually misled or were

likely to have been misled or influenced to the prejudice of the accused . . . [by the prosecutor's actions], reversal of the conviction on this ground would not be justified.'" *Id.* (quoting *Reidy v. State,* 8 Md.App. 169, 172, 259 A.2d 66 (1969)). *See also Marks v. State,* 84 Md.App. 269, 291, 578 A.2d 828 (1990), *cert denied* 321 Md. 502, 583 A.2d 275 (1991).

Three factors must be considered in order to determine whether a prosecutor's remarks are prejudicial to the accused. These are: (1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken by the trial judge to mitigate the effects of the remarks on the jury. *Marks,* 84 Md.App. at 291, 578 A.2d 828. *See also Wilhelm v. State,* 272 Md. 404, 416, 326 A.2d 707 (1974); *Scott v. State,* 64 Md.App. 311, 319, 494 A.2d 992, *cert. denied,* 304 Md. 300, 498 A.2d 1186 (1985). In applying these critical factors to the instant matter, we conclude that prejudicial error occurred. Our view is founded, at least in part, on the difficulty in parsing out the State's closing argument from the events that preceded it. The State's earlier questioning of Ms. Hagez, followed by its final argument, are fatally intertwined.

As we have observed, this was a close case. It is very likely that the jury would have concluded that Ms. Hagez was at the scene when the victim was killed and knew who perpetrated the murder. During her closing argument, the prosecutor insinuated that if Ms. Hagez had information that would have exonerated appellant, she surely would have answered the questions posed by the State. Therefore, "the improprieties of the prosecutor affected the most central issue in the case, appellant's guilt." *Mouzone,* 33 Md.App. at 210, 364 A.2d 58. With respect to the court's earlier efforts "to mitigate," its previous instruction to the jury was insufficient to cure the prejudice, particularly because the prosecutor effectively disregarded the instruction and the court then overruled the defense's objection.

The prosecutor did not merely point out that Ms. Hagez had refused to testify. To the contrary, in telling the jury not to

consider the prosecutor's questions, but only Ms. Hagez's refusal to answer those questions, the prosecutor was asking the jury to infer that the truthful answers to Ms. Hagez's questions would have incriminated appellant.

### Conclusion

If a witness is not entitled to assert the spousal privilege, and is ordered to testify, we would not necessarily quarrel with forcing the witness to assert a statutory privilege in the jury's presence. But in this case, it is what happened afterwards—both in nature and extent—that resulted in unfair prejudice to appellant. We find the words of the Supreme Court in *Berger v. United States*, 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), particularly persuasive:

> In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. If the case against [the defendant] had been strong, or, as some courts have said, the evidence of his guilt "overwhelming", a different conclusion might be reached. [Citations omitted]. Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such conduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded.

The prosecutor's improper actions were pervasive. Nor should the trial judge have allowed the State's zeal in securing a conviction to interfere with appellant's right to receive a fair trial. We have no choice but to reverse.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR A NEW TRIAL. COSTS TO BE PAID BY HOWARD COUNTY.**