CLARENCE MOUZONE *v.* STATE OF MARYLAND

[No. 1124, September Term, 1975.]

*Decided October 6, 1976.*

The cause was submitted on briefs to LOWE, MELVIN and MASON, JJ.

Submitted by *Luther C. West, Assigned Public Defender*, for appellant.

Submitted by *Francis B. Burch, Attorney General, Henry E. Dugan, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City*, and *Howard Grossfeld, Assistant State's Attorney for Baltimore City*, for appellee.

MELVIN, J., delivered the opinion of the Court.

The appellant, Clarence Mouzone, age 19, following a two day jury trial (Dorf, J., presiding) in the Criminal Court of Baltimore in August, 1975, was convicted of second degree murder and the use of a handgun in the commission of a crime of violence. On September 9, 1975, he was sentenced to 30 years imprisonment on the murder conviction and 15 consecutive years on the handgun offense. A single question is presented on appeal:

> "Did the prosecutor intentionally introduce and emphasize irrelevant and incompetent evidence by his comments and questions to witnesses so as to arouse the passion and prejudicially mislead the reasoning process of the jury; thereby denying Appellant due process of law?"

I

On October 12, 1974, at 6:45 P. M. a policeman found the victim, Richard West, lying on the sidewalk in front of Angelo's Tavern at the intersection of 23rd Street and Greenmount Avenue in Baltimore City with a bullet wound in his stomach. He was taken by ambulance to a hospital where he died of the wound later that same day. Neither the appellant nor one James Harrison, age 20, (the State's only material witness) was observed at the scene of the homicide by the policeman.

James Harrison testified that he was a good friend of the deceased, West, and that on the evening in question they ran into the appellant on the street; that appellant and West argued over money appellant owed to West; that appellant

told West to forget about the money; that appellant then continued on his way and West and Harrison moved on to Angelo's Tavern; that they purchased beer in the tavern and moved outside to drink it because it cost less to drink it outside; that appellant reappeared on the scene openly carrying a .22 caliber pistol and asked West if he still wanted his money, and West replied that he did; that appellant then struck West in the face; that West put up his hand to defend himself and appellant backed off and shot him once with the .22 caliber pistol and ran away.

Harrison further testified that he helped West down onto the steps of the tavern and "ran into the bar and told them to call an ambulance". He then ran home "and told my mother or somebody", because he was "scared". He and his brother then returned to the tavern to "see which hospital he was going to". After learning the location of the hospital, he told West's family and then went to the hospital himself. He said he did not go to the police because he was "scared that he [appellant] might shoot me, too". A few days after the shooting the police came to his house and he "went down and gave them an affidavit".

On cross-examination, when asked how he knew the gun he saw in appellant's hand was a .22 caliber, he answered variously, "Because it was a small gun" (although he admitted he couldn't "distinguish between a .22 and a .25 and a .32 in an instant"); "Because they told me he was killed with a .22 *when I went to the hospital.* The bullet he had in him was a .22"; and because "*I saw a small handgun when I went to the hospital.* Dickie's [West's] brother told me it was a .22". No weapon or bullet was produced at the trial and there was no other testimony identifying the weapon or the bullet. The autopsy report introduced in evidence indicates that the victim died at 10:45 P. M. October 12th and that it was not until the autopsy was performed the next day (after the body had been removed from the hospital to the Baltimore City morgue) that the fatal bullet was recovered "in the subcutaneous tissues to the right of the vertebra L2". The report described the bullet only as "a minimally deformed small caliber bullet which is

labeled 'RW' on its base *and which is retained".* It was further established on cross-examination that in a written statement to the police on October 18, 1974, Harrison had denied seeing the appellant "with a gun before the shooting". When questioned concerning his prior criminal record Harrison admitted to one conviction for assault.

Aside from the appellant, the only defense witness was Sharon Spriggs, age 20, who testified that shortly before the homicide she heard West and Harrison "both talking about murdering" the appellant "with a gun"; that she accompanied them to Angelo's Tavern and they were "already high" on Qualades and "wanted to get even higher". She saw West and appellant having a "conversation" outside the tavern. She came out of the tavern and "accidentally slipped". She asked the appellant to help her up and when he did she told him to "come on and forget about this sh- -". She then "turned around to go home" at which time the appellant was "walking" down the street. At this point she heard a shot. When she turned around she saw West slumping to the sidewalk. Harrison was standing nearby with his hands in his pockets. She didn't know where the appellant was after she heard the shot; she "wasn't paying any attention". She and Harrison helped West to the tavern steps and she "ran in the bar and asked for an ambulance or contact somebody because a man just got shot and he needed help". She said that Harrison left the scene "directly after the cops had showed up . . . because he said he was going to shoot Clarence [the appellant]".

Testifying in his own defense, appellant admitted on direct examination that he had been convicted of manslaughter in 1971 when he was 16 years old. He had been paroled in February, 1974, and in October 1974, was working at a grocery store on Greenmount Avenue and attending his first year at Bay College. In July 1974, he witnessed a murder by one Weldon Keen while "sitting on the corner waiting for a bus". He "didn't want to get involved", but someone told the police he "might have seen something" so when the police contacted him he "had no alternative than to take and tell him what I knew to keep myself out of it". He asked the prosecutor not to put his

name on the indictment as a witness, "Because it was like the signing of my own death warrant". "Mr. Keene at that time was in charge of all the dope that was in that area. So, he had a lot of things at his disposal in the criminal world". The murder indictment against Keene was returned on September 23, 1974, with appellant's name at the top of the witness list. When he learned this, appellant called the prosecutor (Joseph Wase, Esq., who had left the State's Attorney's office at the time of appellant's trial) and told him he feared for his life and asked for protection [This was corroborated by the stipulated testimony of Mr. Wase]. Appellant testified that a number of people approached him and told him "to watch out because Weldon Keene wanted me dead". He was told by Mr. Wase and the police detective on the case that ". . . if I was to get caught, I was to give them a call".

Appellant's account of the events leading up to the shooting of West agrees generally with that of Harrison's, except as to the shooting itself. Appellant testified that after he helped Sharon Spriggs up from her fall he started on his way past West and Harrison and "at this time Richard West grabbed me on my right arm. But, I kept moving faster and I put my arm around his neck in a choke hold" from behind his back. This action, which he said took only "a second", placed him directly behind West's back, with West facing Harrison who was standing facing them a few feet away. Appellant described the actual shooting as follows:

"Q What happened then?
A After I had him in the choke hold and locked my arms, there was a shot that went off.
Q Who fired the shot?
A Well, there was only two people there. One was Sandra Spriggs and Mr. Harrison from the direction he was hit.
Q Did you see a gun in Mr. Harrison's hand?
A His hands were in his pocket. I couldn't see his hands.
Q What did you do then?

A   I ran.

Q   Now, you were not — you did not turn yourself in to the police at that time to testify as to what happened, did you?

A   No.

Q   Why did you not turn yourself in at that time?

A   Because I had seen. It stemmed from the Weldon Keene case. I didn't want to get involved in that case. Like I went down there and told what I seen and when I asked somebody for help to save me, there was no help forthcoming. My own hands were tied by the parole board. The only thing I could do was go to somebody else for help. But, nobody gave me help."

The defense theory is simple: James Harrison intended to shoot the appellant, but instead accidentally shot his friend and blamed it on appellant. Aside from Harrison and the appellant, the only other witness at the scene was Sharon Spriggs who testified, on cross-examination by the State, that she didn't know "who shot who". She said she was friendly with all three of the young men involved, i.e., West, Harrison and the appellant, Clarence Mouzone. A prior trial on the same indictment had resulted in a hung jury.

## II

With this background, we turn to the incidents of alleged prosecutorial misconduct allegedly resulting in an unfair trial and therefore a denial of due process.

### (1)

During the prosecutor's opening statement to the jury the following occurred:

"Now, we are here today because there was a murder committed. Please understand that, ladies and gentlemen. We are dealing with someone who

is no longer here. He was a human being. He has a mother and father —

MR. WEST (DEFENSE COUNSEL): I would object. This is improper.

THE COURT: Sustained."

(2)

Shortly thereafter, this occurred:

"If you ask why, what was the motive, ladies and gentlemen, you will hear from the evidence, you will find out that Mr. Clarence Mouzone likes to kill. Take a look at him, ladies and gentlemen. That is a killer. (indicating)

MR. WEST: I object to that, Your Honor, as improper and inflammatory.

THE COURT: All right. I will strike it. It is inflammatory.

MR. GROSSFELD (the Prosecutor): Thank you, Your Honor."

(3)

During the State's direct examination of the witness Harrison, after Harrison stated that he did not go to the police following the shooting of West because he feared the appellant might shoot him, the prosecutor asked:

"Q Because you heard he was a contract killer?

A Well —

MR. WEST: Objection and move that it be stricken.

THE COURT: Sustain the objection and strike it."

(4)

During the cross-examination of the appellant, the prosecutor suddenly asked:

"Q Mr. Mouzone, isn't it true that you get paid to murder people?

MR. WEST: Objection. This is highly inflam-' matory and I move for a mistrial.

THE COURT: I will sustain the objection and the motion is denied.

MR. GROSSFELD: Thank you, Your Honor.

THE COURT: I will instruct the jury to disregard the question."

(5)

During the State's final argument to the jury, the prosecutor said to the jury:

"Doesn't it strike you funny that wherever Clarence Mouzone is, there is murder and a dead body?

MR. WEST: Objection.

THE COURT: We are referring to this case only. I will sustain the objection as to any other."

(6)

The State's final argument to the jury was concluded as follows:

"Ladies and gentlemen, when it's all done, you will find that Clarence Mouzone's story is hard to swallow; that he is a violent person. He's lived a criminal life.

MR. WEST: Objection, Your Honor. He's lived a violent life. I move that that be striken (sic).

THE COURT: I will allow the jury to consider any evidence. I instruct them and I will instruct them again that any prior record has no significance as far as prior life is concerned. But, there is evidence of his prior life.

MR GROSSFELD: Ladies and gentlemen, I am talking about what he said on the stand. Mr. Clarence Mouzone is the type of person, ladies and gentlemen, look at him hard. You are looking at a killer.

Thank you."

There was no objection by defense counsel to Mr.

Grossfeld's concluding paragraph. Appellant cites other incidents of alleged prosecutorial misconduct as to which no objections were made during the trial. Although such incidents were later urged as a grounds for reversal at the hearing on appellant's motion for a new trial, no appeal was taken from the court's ruling denying the motion. As to those incidents to which no objections were made during the trial there is no ruling of the trial court before us for review and we do not consider them. *Apple v. State*, 190 Md. 661 (1948); Md. Rule 1085.

## III

That the prosecutor's actions complained of were exceedingly improper and calculated to unfairly prejudice the jury against the appellant is scarcely a matter for argument. The Maryland rule, however, is that "unless it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused . . . [by the prosecutor's actions], reversal of the conviction on this ground would not be justified". *Reidy v. State*, 8 Md. App. 169, 172 (1969).

Concerning what may be "prejudicial", the Court of Appeals in *Wilhelm v. State*, 272 Md. 404 (1974), at 416, quoted with approval from *Gaither v. United States*, 413 F. 2d 1061 (D.C. Cir. 1969) wherein the Federal Court said, at 1079:

> "The applicable test for prejudice is whether we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error. The decisive factors are the closeness of the case; the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error". (Citations omitted.)

Applying the decisive factors to the present case, the "closeness of the case" is obvious, for its outcome depends directly on the credibility of the appellant and the State's witness, Harrison. There is no question but that one of them

shot the victim. We do not think appellant's version so implausible as to be dismissed out of hand as a mere denial of guilt. Considering what appears to be the nearly equal backgrounds of the two and the apparently compromise nature of the verdict, [As the State argued to the jury, if it believed Harrison's version, "its either first degree or its not guilty."], that the jury had difficulty in resolving the conflict is obvious. An earlier jury was unable to do so, presumably on the same evidence.

Regarding the "centrality of the issue affected" factor, the improprieties of the prosecutor affected the most central issue in the case, appellant's guilt. The prosecutor repeatedly tried to create the impression that appellant committed the murder because he "likes to kill", was a "contract killer", was "paid to murder people", was a "violent person", "had lived a criminal life" and because "wherever Clarence Mouzone is, there is murder and a dead body". The record does not justify such extreme remarks. Nevertheless, the prosecutor was clearly calling upon the jury to consider them as substantive evidence of guilt.

We come now to the "steps taken to mitigate the effects of the error" as to each of the incidents described in Part II of this opinion:

1. We think the prosecutor's remark was not so prejudicial as to call for more than a sustaining of the objection made by defense counsel. No other action was requested and in this instance we think none was required. *Newton v. State*, 147 Md. 71, 92 (1924).

2. The remarks here ("You will find out that Clarence Mouzone likes to kill. Take a look at him, ladies and gentlemen. That is a killer (indicating)") were highly improper and were correctly stricken by the trial judge as being "inflammatory". Here we think the judge should have gone further and *forthwith* instructed the jury to disregard the unwarranted remarks. *Contee v. State*, 223 Md. 575, 584 (1960).

3. The question asked the State's witness ("Because you heard he was a contract killer?"), in addition to being an improper leading question, was extremely prejudicial.

Although the trial judge did strike the question, here again we think more was required to remove the deleterious effect that the ill-considered question may have had on the jury. As the Court of Appeals said in *Contee v. State, supra*, at 594:

> " . . . [T]he State's Attorney has an obligation to refrain from making any remark within the hearing of the jury which is likely or apt to instigate prejudice against the accused. We further point out that, while granting or refusal of a mistrial is a matter lying within the sound discretion of the trial court, the court, nevertheless, *in addition to sustaining an objection* to an improper remark or misconduct, is also entrusted with *further responsibility to caution or reprimand the State's Attorney* as the exigencies of the situation may require *and to forthwith instruct the jury* to disregard the unwarranted remarks and conduct of the prosecuting attorney." (Emphasis added.)

4. Apparently oblivious of the court's ruling on his prior attempt to inject the thought that the appellant was a hired killer, the prosecutor persisted in repeating the insinuation by asking the appellant, "Mr. Mouzone, isn't it true that you get paid to murder people?" Here, short of granting the requested mistrial, we think the "exigencies of the situation" cried out for the strongest of remedial action by the trial court. Although the jury were told to "disregard the question", we think that, in addition, the prosecutor should have been sternly reprimanded and cautioned against such conduct. Further, the jury should have been told of the complete absence of any evidence in the case whatsoever that appellant was a "hired killer".

5 and 6. Here again, the prosecutor was calling upon the jury to convict, not because of the substantive evidence of guilt, but because of the insinuation that he had murdered before and because he was "a violent person" and had lived a "criminal life". The trial court's response to the objections made ("We are referring to this case only. I will

sustain the objection *as to any other.*" and "I will allow the jury to consider *any evidence.* I instruct them ... that any prior record has no significance as far as prior life is concerned. *But, there is evidence of his prior life".)* we find confusing and inadequate to dispel the notion that there was evidence of "any other" murder committed by the appellant, that there was evidence he was a "violent person" and had "lived a criminal life" or that the jury should consider such "evidence" as substantive evidence of his guilt of the crime for which he was then being tried. See *Gilchrist v. State,* 2 Md. App. 635 (1967).

In this case, we need not decide whether any one of the separate incidents of prosecutorial misconduct and the trial court's responses thereto warrant reversal as being a denial of due process. We think what was said by the Supreme Court in *Berger v. United States,* 295 U. S. 78 (1935) is applicable here. The Court said at pp. 88-89:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge

are apt to carry much weight against the accused when they should properly carry none. . . ."

After noting the closeness of the case against Berger the Court concluded:

"In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt "overwhelming", a different conclusion might be reached. [citations omitted]. *Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such conduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded*". (Emphasis added.)

> *Judgments reversed.*
> *Case remanded for new trial.*
> *Costs to be paid by Mayor and City Council of Baltimore.*