726 A.2d 858

**Ricky Edward WHITE**

v.

**STATE of Maryland.**

No. 1567, Sept. Term, 1997.

Court of Special Appeals of Maryland.

April 5, 1999.

686

Amy L. McGinnis (Jennifer P. Lyman, Assigned Public Defender, on brief), Washington, DC, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., Baltimore, and Jack B. Johnson, State's Atty. for Price George's County, Upper Marlboro, on the brief), for appellee.

Argued before MOYLAN, SONNER and BYRNES, JJ.

SONNER, Judge.

The appellant in this case complains that he received an unfair trial for two reasons: first, because the court refused to give the jury his requested instruction about good character evidence and, second, because the court, after improper remarks in the assistant state's attorney's closing argument, failed to admonish the prosecutor in front of the jury. On the first issue, we hold that the court was correct in refusing to give the requested instruction. As for the second issue, we hold that the trial judge, after finding the prosecutor's remarks improper, was justified in not taking further action.

Both appellant, Ricky Edward White, and the State agree that on June 2, 1996, sometime around six in the evening, Mr. White, while driving on Thrift Road, a rural road in the Clinton Piscataway area of Prince George's County, swerved to avoid some deer and crashed his rented Cutlass Ciera into a ditch. The crash rendered the car inoperable. A passerby, Maryann Murphy, drove her pick-up truck to the spot of the accident and stopped and watched White get out of the car and inspect the damage. White then approached her and, in response to her question as to whether he needed help, asked her to call the police, and then walked away. Mrs. Murphy, apparently using a citizen band radio, called for her brother, James Murphy, a Prince George's County police corporal stationed at the Clinton Substation. When Cpl. Murphy arrived, he ran a radio check on the license tags of the damaged car to determine whether it was stolen. The reply came back that it was not. While he was waiting for the report, he entered the car and found a rental agreement with Ricky

White's name on it. He then obtained a description of White from his sister and gave a radio lookout for a black male, wearing dark shorts and a white T-shirt. He apparently intended to charge White with a motor vehicle offense in connection with the accident. After that, he called a crane and had the vehicle impounded.

The accounts of what happened after that diverge. Mr. White testified at trial that he walked down Thrift Road to Winbrook Drive and hitched a ride from a stranger to Livingston Square Mall. He testified that he went into the mall and unsuccessfully attempted to call his parents, and then went outside, where he was hit on the head by some unknown person or persons and placed in a dumpster. It was not contested that a security guard found him there and called the police, who arrived with some paramedics and helped him out of the dumpster. He told the paramedics that he was dizzy and hurt and so they gave him first aid. Because the officers who responded with the paramedics knew of the earlier lookout that Cpl. Murphy had placed over the radio, they made a request through the police dispatcher for him to go to the Livingston Square Mall. Corporal Murphy did so, but, first, stopped by his sister's home to transport her to where the other police officers, the security guard, and the paramedics were waiting with White. After his sister identified White as the person who had spoken to her at the scene of the accident on Thrift Road, Cpl. Murphy handcuffed White and placed him under arrest for leaving the scene of the automobile accident. He first took White to Fort Washington Ambulatory Hospital for emergency treatment and, then, to a police station to institute formal charges. White was released almost immediately after that, but then turned himself in several days later, after learning that a detective had gone to his parents' home in search of him. The detective was looking for White as a suspect in a carjacking that occurred approximately a mile from where White had abandoned his car.

The prosecution alleged that White did not hitch a ride and go directly to the Livingston Square Mall, but, instead, walked to a neighborhood not far from where he had the accident and

approximately one block from the road where White claimed he obtained a ride from a stranger. The State produced evidence to show that a man matching White's description and dressed in a white T-shirt and dark shorts walked to where Ms. Desmona Conner was standing beside her car with the door open. She had gone there to pick up her daughter and was waiting for her to come out to her car. Ms. Conner testified that the man, whom she later identified as White, just walked up, pushed her out of the way, sat down behind the steering wheel, and then drove away in her car. Ms. Conner's friend, Celeste Camphor, had been seated in the front passenger seat and, as the stranger was driving away, tried to put the gearshift located between the seats into reverse to stop the car. When she failed at that, she jumped out of the moving vehicle. Later, the car was located and retrieved off Indian Head Highway, close to the Livingston Square Mall. Both Ms. Camphor and Ms. Conner picked out White's picture from a photo array and identified him in the courtroom at trial. The description that they gave the police on the night of the carjacking closely matched White's appearance, and he was dressed in a white T-shirt and blue shorts when the security officers found him in the dumpster, the exact same clothing that Ms. Conner and Ms. Camphor, as well as Mrs. Murphy described White as wearing. The prosecution argued that White's being in the Livingston Square Mall dumpster was an attempt to hide and that the injuries that he incurred and the paramedics treated him for came from the Thrift Road accident, not from any attack. The Grand Jury for Prince George's County had charged White with robbery, kidnapping, battery, and carjacking. After the jury trial, White was acquitted of kidnapping, but was found guilty of the other charges.

## I.

White's first allegation of error is that the court failed to give his requested jury instruction regarding character evidence. It is fundamental that the court instruct the jury as to all the applicable law if either party requests the court to do

so. Md. Rule 4–325(c). To be entitled to any instruction, however, there must be at least some evidence to generate a need to address the issue. *Dykes v. State,* 319 Md. 206, 221, 571 A.2d 1251 (1990); *Flores v. State,* 120 Md.App. 171, 192– 93, 706 A.2d 628 (1998); *McKay v. State,* 90 Md.App. 204, 214, 600 A.2d 904 (1992). The critical question here is whether White produced any evidence to generate the issue as to character.

The usual manner for a defendant to raise character as an issue is to call at least one witness who is familiar with particular traits, either because of knowledge of the defendant's reputation or from personal observation. Maryland Rule 5–405 provides that a witness can testify as to reputation, relate specific instances of a person's conduct, or simply give an opinion about a specific character trait. The Maryland General Assembly, many years ago, modified the common law, which restricted character evidence to testimony about reputation in the community. Section 9–115 of the Courts and Judicial Proceedings Article provides:

> Where character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character, either in person or by deposition, in any suit, action or proceeding, civil or criminal, in any court or before any judge, or jury of the State.

The change now permits the admission of a broad range of testimony that the common law previously had prohibited and may aid the jury in assessing the credibility of a witness. *Kelley v. State,* 288 Md. 298, 302, 418 A.2d 217 (1980); *Taylor v. State,* 278 Md. 150, 154–55, 360 A.2d 430 (1976).

White did not call any witnesses to give their opinions as to his reputation for any character trait, to testify as to his reputation in the community, or to recite specific instances of good conduct. He did testify in his own behalf as the only

witness for the defense, and maintains that his testimony put his character in issue. Here is how that developed:

[DEFENSE ATTORNEY:] Mr. White, since the age of 18, have you ever been convicted of a crime?

[DEFENDANT:] Yes, I have.

[DEFENSE ATTORNEY:] Could you explain to the ladies and gentlemen of the jury what crime you've been convicted of and when?

[DEFENDANT:] I been convicted of robbery during, like it was, like '89. I been convicted of like two counts of robbery, and I guess robbery.

[DEFENSE ATTORNEY:] Have you been convicted of anything else?

[DEFENDANT:] No.

[DEFENSE ATTORNEY:] Did you serve any time in incarceration?

[DEFENDANT:] Holdup. Excuse me, yes, I'm also convicted of possession of drugs before.

 \* \* \* \* \* \*

[DEFENSE ATTORNEY:] Mr. White, since then you've had an opportunity to get yourself together?

[DEFENDANT:] Yes, sir.

[DEFENSE ATTORNEY:] Are you doing things now you weren't doing before?

[DEFENDANT:] Yes.

[DEFENSE ATTORNEY:] Could you explain to the ladies and gentlemen of the jury what those things are?

[ASSISTANT STATE'S ATTORNEY:] Objection, Your Honor.

THE COURT: What's the relevance?

[DEFENSE ATTORNEY:] What's the relevance?

THE COURT: Yes.

[DEFENSE ATTORNEY:] He'll explain it.

THE COURT: To whether he's guilty or innocent of this charge?

[DEFENSE ATTORNEY:] I'm just getting some background information on him. **It's strictly background information.**

THE COURT: All right. I'll let you ask this one question and then get to the business of the case.

[DEFENSE ATTORNEY:] You since turned your life around, right?

[DEFENDANT:] Yes, I have.

[DEFENSE ATTORNEY:] How long has it been since you turned your life around?

[DEFENDANT:] It's been a while now.

[DEFENSE ATTORNEY:] What's that?

[DEFENDANT:] About a couple years now.

[DEFENSE ATTORNEY:] What's a couple years?

[DEFENDANT:] Like two years.

[ASSISTANT STATE'S ATTORNEY:] Objection, Your Honor.

[DEFENSE ATTORNEY:] What are you doing now?

[DEFENDANT:] I'm an active member at my church. I volunteer at church.

[ASSISTANT STATE'S ATTORNEY:] Objection.

THE COURT: This is not a sentencing here. We're here on whether or not he committed this crime.

[DEFENSE ATTORNEY:] I'll move on. We're going to get to it.

THE COURT: I'm saying you want to ask relevant questions relevant to the matter that's before us.

[DEFENSE ATTORNEY:] Your Honor, may we approach?

THE COURT: Yes.

(Discussion held at the bench.)

THE COURT: You're getting into—

[DEFENSE ATTORNEY:] He had some things in his background that he needs to explain before we can move on with his testimony. What I'm simply trying to do is let him

explain those things that, the blemishes in his background, his criminal history and more.

THE COURT: Okay.

[ASSISTANT STATE'S ATTORNEY:] If Your Honor allows him to do so, he's turning it into—

THE COURT: I see what he's saying, though. If he hadn't brought this out you would have, and he's trying to—

[ASSISTANT STATE'S ATTORNEY:] Now he's getting into whether he goes to church and turning his life around. That's not relevant to car jacking.

[DEFENSE ATTORNEY:] This is a clarification of his background. You're going to bring this out. Maybe what he's crying about is I'm lessening the impact. This is trial strategy. People need to know whether—what he's going on, he's being charged with the same thing. He needs to be able to explain that. I just want him to show the ladies and gentlemen of the jury now he is a reformed individual.

THE COURT: All right. Well, go ahead and make it as concise as possible.

(In open court.)

[DEFENSE ATTORNEY:] You were saying, Mr. White?

[DEFENDANT:] I volunteered different churches to clean their carpet for free of charge. I mean as far as dealing with my life and everything, you know, I had my problem in life and everything like that, but I believe that, you know, through the grace of God that everybody could change and no matter what you do, you know that God will forgive you. You know, some things you do, you know God will forgive you anything you do. And I truly changed my life and the way, as far as my thinking, you know, from when I was say 25, you know, 24 and younger than that, and it's not easy, but, you know, it's a struggle for me and I'm trying very hard and, you know, I believe that God is my strength, my shield.

[DEFENSE ATTORNEY:] You also mentioned you had a bout with drugs?

[DEFENDANT:] Yes.

[DEFENSE ATTORNEY:] Did you ever straighten out that part of your life?

[DEFENDANT:] Yes, I did.

[ASSISTANT STATE'S ATTORNEY:] Objection, Your Honor.

[DEFENSE ATTORNEY:] In what way?

THE COURT: Overruled.

[DEFENDANT:] Through the lord and also went into a program, Hadassa (sic) program before I went into one of those to straighten myself out also.

(Emphasis added.)

The question, then, is whether, through this testimony about himself, White put before the jury evidence that generated the issue of his character so as to entitle him, under Md. Rule 4–325, to have the jury instructed as to the applicable law that applies to character evidence.

The requested instruction would have informed the jury that evidence of good character may be considered in connection with other evidence to create a reasonable doubt as to guilt.[1] It is clear from the record that White offered his testimony about his job, his church attendance, his volunteer services, and his drug rehabilitation for the purpose of background. He wanted that evidence before the jury to lessen the "sting" that he knew would result from the certain disclosure during cross-examination of his three prior convictions.

It is beyond question that it is within the court's discretion to permit the introduction of background evidence. In *Mayor and City of Baltimore v. Zell*, 279 Md. 23, 367 A.2d 14 (1977), Judge Eldridge explained:

---

1. Maryland's pattern jury instruction for impeachment by prior conviction, Version A, states: "You have heard evidence that the defendant has been convicted of a crime. You may consider this evidence in deciding whether the defendant is telling the truth, but for no other purpose. You must not use the conviction as any evidence that the defendant committed the crime charged in this case." *Maryland Criminal Pattern Jury Instructions* 3:22 (1997).

It is a routine practice in trials for an attorney to ask his witness certain preliminary questions which may not be relevant to the issues being litigated, which may go beyond mere identification and which are designed to show that the witness will be somewhat credible or not biased in favor of the side calling him. For example, the educational background or professional status or employment position of a non-expert witness may be asked, or the witness's lack of prior contact with the side who has called him may be brought out. These questions give the jury some knowledge of the individual and a more complete perspective in considering his testimony. *Cf. Kelly v. Redevelopment Authority of Allegheny Co.*, 407 Pa. 415, 180 A.2d 39, 45 (1962).

We agree that such questions, within reasonable limits, serve the useful function of informing the jury about the witness, and therefore they may be allowed. The extent to which such questions are permitted must, in our view, remain in the sound discretion of the trial judge. In the absence of a clear abuse of discretion in a particular case, the action of the trial judge in permitting or not permitting them will be upheld. In the case before us, there was no abuse of discretion in allowing the defendants to bring out the fact that the witness whom they called had initially been employed in the matter by the other side.

*Id.* at 28, 367 A.2d 14 (footnote omitted).

■ Even had White not limited his use of the background testimony during his proffer, his testimony did not generate the character issue. If it were permissible to raise the issue in the extended preliminary questions and answers to improve the jury's perspective, then all parties, in all cases, civil and criminal, would be entitled to do the following: first, to bring into evidence as "background" their own opinions about themselves and descriptions of their good deeds, real and imagined, and, then, have the court instruct and the jury consider the parties' own personal opinions of themselves and their accounts of good deeds in deciding the other issues. That is not the law. The permissible introduction of evidence from a witness or a defendant to show background is to give context

to the relevant and material testimony that will follow. Were background testimony to generate the issue of character, it would add little more than a diversion of the trial away from central issues.[2] The character issue was not generated here and the court was correct in refusing to give any instruction about character.

## II.

This brings us to the second issue—the allegation that the assistant state's attorney, in his argument to the jury, on several occasions made improper remarks, and that the court abused its discretion by not admonishing the prosecutor in front of the jury.

During closing argument, the assistant state's attorney, right after a few sentences apologizing for "confusion and delay," made the following comments, which, as the record shows, were interrupted by objections:

> [ASSISTANT STATE'S ATTORNEY:] As I told you yesterday, this is an important case. The defendant is a dangerous person—
>
> [DEFENSE ATTORNEY:] Objection.
>
> THE COURT: Overruled. This is closing.

---

**2.** White's background testimony, were it sufficient to generate the character issue, would have entitled the prosecutor to introduce testimony to contradict White's assertion that he had turned his life around. Maryland Rule 5–404(a)(1)(A) permits the State to call its own witnesses in rebuttal to give unfavorable opinions or reputation testimony that contradicts that which defendants have chosen to place into evidence. *Comi v. State,* 202 Md. 472, 478–79, 97 A.2d 129, *cert. denied,* 346 U.S. 898, 74 S.Ct. 223, 98 L.Ed. 399 (1953); 5 LYNN MCLAIN, MARYLAND EVIDENCE §§ 404.1(c), 404.2 (1987 & Supp.1995). It would not have been permissible for the State here to show that, in spite of his alleged good deeds and religious conversion, he was still the kind of person who would commit carjacking, robbery, and drug offenses. In other words, a defendant's background evidence does not thereafter open the door to permit the introduction of whatever contrary evidence the State might have available to rebut the background evidence and permit the jury to draw a contrary conclusion to that which the defendant hopes the jury will incidentally infer about his character.

[ASSISTANT STATE'S ATTORNEY:] He's a dangerous person. He's the type of person who takes the property of another by force and fear, and you heard that yesterday. You heard how it was accomplished. What I'm going to do is go through the facts the witnesses testified to and show you how we proved each and every element. . . .

[DEFENSE ATTORNEY:] Objection, Your Honor.

THE COURT: Overruled.

The assistant state's attorney then proceeded to discuss the individual counts in the indictment and explain the various elements and the evidence that supported conviction. When he came to the crime of kidnapping, the following transpired:

[ASSISTANT STATE'S ATTORNEY:] Kidnapping, kidnapping; the judge defined that for you, but basically it means confining or detaining Celeste Camphor against her will, using force to accomplish that, and moving Celeste Camphor from one place to another, and with the intent to carry Miss Camphor from one place to another. I will concede that it's a close call. It's your community. Are you going to go back and make the decision?

[DEFENSE ATTORNEY:] Objection.

THE COURT: Overruled.

\* \* \* \* \* \*

[ASSISTANT STATE'S ATTORNEY:] It's an important case, and I hope that doesn't get lost in the confusion and the delays that you've had to suffer through the last couple days. I submit to you that Mr. Ricky White is a dangerous person. He's the type of person that you read about in the papers, that you're afraid of.

[DEFENSE ATTORNEY:] Objection, Your Honor.

[ASSISTANT STATE'S ATTORNEY:] Going out at night—

[DEFENSE ATTORNEY:] Objection.

THE COURT: This is closing.

[DEFENSE ATTORNEY:] I understand.

[ASSISTANT STATE'S ATTORNEY:] The kind of person who you're looking behind you at the ATM [3] machine. He's a dangerous person.

[DEFENSE ATTORNEY:] Your Honor, may we approach?

THE COURT: Approach.

(Discussion held at the bench.)

[DEFENSE ATTORNEY:] Your Honor, this case is about whether or not my client committed these crimes, not about all the social ills in society. He's trying to say something that's unduly prejudicial to my client. I understand this is argument.

THE COURT: I think he has a right to argue in closing what he's arguing.

[DEFENSE ATTORNEY:] Your Honor, I understand this is closing argument, but when he starts to try to engender the fear we all have because of society because of this case, that's going overboard. That's the prejudicial misconduct, and I'm going to move for a mistrial if he continues.

[ASSISTANT STATE'S ATTORNEY:] I'll move on. I'm almost done, but I do think it's fair argument.

[DEFENSE ATTORNEY:] I would move to strike it.

THE COURT: The fact he doesn't like it—

[ASSISTANT STATE'S ATTORNEY:] How is he going to strike my closing argument?

[DEFENSE ATTORNEY:] If not, I'm moving for mistrial.

[ASSISTANT STATE'S ATTORNEY:] He can move for a mistrial. It's no basis for a mistrial.

THE COURT: It's no basis for a mistrial.

[DEFENSE ATTORNEY:] Very well.

THE COURT: I think you can curtail those comments. Thank you.

---

3. ATM is an acronym for "automatic teller machine."

[DEFENSE ATTORNEY:] This is totally inappropriate, Your Honor. It's totally inappropriate and I think admonishment is at least proper or strike or what I just said. He's taken this beyond this case and making it to address the ills of society.

THE COURT: He's bringing to the attention of the jury that it's a very serious crime and the defendant is guilty of these crimes, he's a dangerous person. That is all he's saying.

[DEFENSE ATTORNEY:] Your Honor—

[ASSISTANT STATE'S ATTORNEY:] Can I finish?

THE COURT: He has to prove it.

[DEFENSE ATTORNEY:] I move to strike those comments, for the record. They're unduly prejudicial and go far across the line of what closing argument is supposed to be used for. It is wrong.

[ASSISTANT STATE'S ATTORNEY:] I'm ready.

[DEFENSE ATTORNEY:] If Your Honor—he needs to come back so I can finish my argument.

THE COURT: He's still arguing.

[ASSISTANT STATE'S ATTORNEY:] Is he going to delay this, too?

[DEFENSE ATTORNEY:] It doesn't matter. I'm defending my client. You do what you do, I do what I do. If there's no admonishment, Your Honor, I'm going to move for a mistrial at this point.

THE COURT: Thank you.

[DEFENSE ATTORNEY:] May I have a ruling?

THE COURT: You [sic] get my ruling. Sit down.

[DEFENSE ATTORNEY:] What is the ruling?

THE COURT: You'll hear it when you sit down.

(In open court.)

THE COURT: All right, ladies and gentlemen of the jury, I want you to disregard the characterizations of the defendant in the last few moments of the closing argument.

[ASSISTANT STATE'S ATTORNEY:] I'm going to close my argument drawing your attention to the acts of Mr. White, acts that were uncalled for, acts that jeopardized people's property and jeopardized their lives. In the strongest terms that I can ask you, I'm going to ask you to hold Mr. Ricky White accountable. Failure to hold Mr. Ricky White accountable is to tell him it's okay any time you want someone's property to take it—

[DEFENSE ATTORNEY:] Objection, Your Honor.

[ASSISTANT STATE'S ATTORNEY:] By force, by fear.

[DEFENSE ATTORNEY:] Objection.

THE COURT: Overruled.

[DEFENSE ATTORNEY:] Same argument.

[ASSISTANT STATE'S ATTORNEY:] Or intimidation.

[DEFENSE ATTORNEY:] When he gets to where I think he's over the line, then I respond.

[ASSISTANT STATE'S ATTORNEY:] Mr. White went over the line.

THE COURT: All right, ladies and gentlemen, we're going to take a break now and we'll come back and hear the defendant's closing argument.

* * * * * *

(The jury was dismissed from the courtroom.)

[ASSISTANT STATE'S ATTORNEY:] May counsel and I approach?

THE COURT: Yes.

(Discussion held at the bench.)

THE COURT: [Defense attorney], I granted and denied the last motion. I granted the motion to withdraw the comments and denied the motion for a mistrial.

The landmark case for closing arguments in criminal cases is *Wilhelm v. State,* 272 Md. 404, 326 A.2d 707 (1974). Practically every decision after *Wilhelm* that has addressed a prosecutor's closing arguments has cited it and quoted Judge O'Donnell. Judge O'Donnell wrote for the Court:

[T]he prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the [prosecution] produces.

\* \* \* \* \* \*

There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

*Wilhelm,* 272 Md. at 412–13, 326 A.2d 707.

Judge O'Donnell explained that the fundamental limitation upon the remarks of attorneys is that they may not appeal to the passions or prejudices of the jurors. *Id.* at 445, 326 A.2d 707 (citing *Wood v. State,* 192 Md. 643, 652, 65 A.2d 316 (1949)). Although the terms "passion" and "prejudice" are linked in Judge O'Donnell's exposition, each draws a separate limitation upon the permitted scope of closing argument.

First, considering passion, it is easy to state in an appellate opinion that an attorney's final argument should be an appeal to reason and not to passion or emotion, but there are emotional overtones in most criminal cases, especially when the crimes charged are violent. Judge Learned Hand observed:

It is impossible to expect that a criminal trial shall be conducted without some show of feeling; the stakes are high, and the participants are inevitably charged with emotion.

*U.S. v. Wexler,* 79 F.2d 526, 529–30 (2d Cir.1935), *cert. denied,* 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991 (1936).

■ Neither prosecutors nor defense attorneys can be expected to separate their appeals to reason and logic from the passions that the crimes naturally arouse in them as well as jurors. Often the prosecutor's simply recounting the facts in evidence about how the charged crime occurred will arouse passions, yet it is not improper to argue the passion arousing facts to the jury. A defense attorney's arguing the grave jeopardy that the accused faces may arouse sympathetic emotions in the jurors. Nevertheless, attorneys should always be free to recount, underscore, and emphasize the admitted evidence, even though juries may react emotionally on hearing recounted that which they heard from the witness stand or observed in exhibits or know from their common experience.[4]

■ Appellate courts have, in scrutinizing closing argument, approved the prosecutors' mentioning the conditions of crime within the community, such as the commonly understood murder rates, *Wilhelm,* 272 Md. at 440–41, 326 A.2d 707, and the scourge of drugs, *Davis v. State,* 93 Md.App. 89, 124, 611 A.2d 1008 (1992), *aff'd,* 333 Md. 27, 633 A.2d 867 (1993), but such arguments must clearly confine themselves to the recounting of common knowledge and not put before the jury facts not in evidence. Neither should the argument make an appeal to convict upon less than sufficient evidence. An argument that the community is concerned about the serious effect of a certain crime must be framed in such a way as to remind the jury of its duty to convict when the evidence supports conviction, and not for the jurors to place their own personal interests before their obligation to decide the issues on the evidence. *Colvin-el v. State,* 332 Md. 144, 177–80, 630

---

4. There is, of course, an ethical restraint on the prosecutors—as indeed there is upon the defense attorneys—in arguing about the evidence. They must conduct themselves with "candor and fairness" with the court and the other attorneys. MODEL RULES OF PROFESSIONAL CONDUCT, Rule 3.3 (1983). That would preclude misquoting anyone in connection with the case or asserting as a fact that which has not been proven or exaggerating those facts that have been proven. The ethical restraints would prohibit asserting personal knowledge of the facts in issue or a personal opinion as to the justness of a cause, the credibility of a witness, or the guilt or innocence of an accused. *Id.* 3.4(e).

A.2d 725 (1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 849 (1994); *Holmes v. State,* 119 Md.App. 518, 526–27, 705 A.2d 118 (1998). When prosecutors or defense attorneys accurately recount the evidence, even though the evidence arouses emotion, they do not trespass beyond the line that prohibits an unwarranted appeal to passion. The evil to be avoided is the appeal that diverts the jury away from its duty to decide the case on the evidence. ABA STANDARDS FOR CRIMINAL JUSTICE 3–5.8(d) (3d ed.1993). Those arguments calculated to do so are what the law forbids by an appeal to passion, not those arguments that recount the evidence that evokes sympathy or emotion and therefore touches the passions of normal jurors.

A final argument containing an appeal to prejudice may be quite a different appeal from one that appeals only to passion. An appeal to prejudice can be an overture to jurors to decide a case using preexisting favorable or unfavorable opinions about certain groups of people based on perceived generalities or stereotypes. *Contee v. State,* 223 Md. 575, 582–84, 165 A.2d 889 (1960). Although it is highly likely that some or all of the jurors may entertain some of the prejudices that exist in their communities, there can be no justification for prosecutors, or defense attorneys for that matter, to exploit those prejudices and subtly or otherwise ask jurors to reach a verdict based in the slightest upon their prejudices. *Holbrook v. State,* 6 Md.App. 265, 268–69, 250 A.2d 904 (1969). Such appeals are "offensive to the dignity and good order with which the proceedings in court should be conducted." *Viereck v. U.S.,* 318 U.S. 236, 248, 63 S.Ct. 561, 87 L.Ed. 734 (1943) (Black, J., dissenting); *U.S. v. Richardson,* 161 F.3d 728 (D.C.Cir.1998); *see also Kelly v. Stone,* 514 F.2d 18 (9 th Cir.1975); *U.S. v. McKendrick,* 481 F.2d 152 (2d Cir.1973); *Commonwealth v. Graziano,* 368 Mass. 325, 331 N.E.2d 808 (1975), *later app.,* 371 Mass. 596, 358 N.E.2d 776 (1976). Appeals to prejudice by lawyers in closing argument run the danger of imploring the jurors to decide, not because they are persuaded by the evidence, but, instead, because of considerations that have no place in the courtroom. Judge O'Donnell,

in *Wilhelm*, approved of comments that speak harshly about the "accused action and conduct." *Wilhelm*, 272 Md. at 413, 326 A.2d 707. That language should not be viewed as permission to launch an *ad hominem* attack upon the defendant. There is a difference between commenting harshly about a defendant and commenting harshly about a defendant's alleged criminal conduct. It is perfectly acceptable to condemn in severe language the details of the cruel crime of which the defendant is accused. But when a prosecutor's argument asks the jury to scorn the defendant because of economic or social class, race, or appearance, those remarks stray from the roadway of permissible comment and cannot escape condemnation just because the law permits some vigorous advocacy. The opportunity during closing argument for attorneys to use eloquence, oratorical skills, illustrations, metaphors, anecdotes, and literary references does not provide a medium for the attorney improperly to arouse prejudice, intentionally or unintentionally. *See Taylor v. U.S.*, 413 F.2d 1095 (D.C.Cir.1969).

We now turn to a consideration of the remarks in the case before us. In determining on appeal whether a prosecutor's remarks deprived a defendant of due process, we are directed to consider, first, whether the remarks were improper and whether they involved a central issue or central issues. *Hagez v. State*, 110 Md.App. 194, 226, 676 A.2d 992 (1996). Second, if the remarks were improper on some central issue, we ask whether the trial judge took steps to mitigate or eliminate the effect of the prosecutor's remarks. *Id.* And then, third, we evaluate how close was the case—an evaluation of how profound was the harm to the defendant's right to a fair trial. *Id.*

The prosecutor's condensed remarks were as follows:

As I told you yesterday [referring to his opening statement [5] ], this is an important case. The defendant is a dangerous

---

5. In his opening remarks, the assistant state's attorney made the following statement: "And I'm confident when you hear the witnesses as they come up and speak to you, you see the diagrams, you'll see that the case is quite frankly overwhelming. It is the kind of conduct that White

person. He's the type person who takes the property of another by force and fear.... I submit that Mr. Ricky White is a dangerous person. He's the type of person that you read about in the papers, that you're afraid of. Going out at night, the kind of person who you're looking behind you at the ATM machine. He's a dangerous person.

Those remarks are not clearly directed toward the crime with which the appellant stood accused, but, instead, appear directed at him personally. Calling him "dangerous" and "one who takes your property by force and fear," flows from the evidence adduced at trial. At worst, "dangerous" was a mild epithet, one not likely to stir the passions or prejudices of the jurors to any appreciable degree. On the other hand, when the prosecutor linked the epithet with a designation of the defendant as "the kind of person" the jurors would fear "when you are looking behind you at an ATM machine," the court perceived he was going beyond the boundaries of fair comment.

The court did not assign a reason for sustaining the appellant's objection and simply instructed the jury to disregard the prosecutor's remarks. We note that, during closing argument, the prosecutor, in contrasting the State's witnesses with the defendant, mentioned the defendant's two convictions for robbery. The defendant, himself, for strategic reasons, at the beginning of his direct examination, had revealed them. By characterizing the defendant as "dangerous" and, practically in the same breath, referring to him in terms of being one who the jurors might fear would rob them at an ATM machine, the prosecutor ran the risk that the jurors would infer that the reason he was dangerous was that his convictions were for robbing others at an ATM machine. As the Court of Appeals has pointed out, prior convictions "may have a tendency to suggest to the jury that if the defendant did it before he probably did it this time." *Prout v. State*, 311 Md. 348, 364,

---

perpetrated on June 2, 1996 that's outrageous, the kind of conduct makes us all a little bit afraid to go to the ATM machine at night, go shopping late at night."

535 A.2d 445 (1988), *superseded by rule on other grounds, Beales v. State,* 329 Md. 263, 619 A.2d 105 (1993). Rule 1–502, then, is aimed at "prevent[ing] a jury from convicting a defendant based upon his past criminal record, or because the jury thinks the defendant is a bad person." *Jackson v. State,* 340 Md. 705, 715, 668 A.2d 8 (1995).

Evidence of a prior conviction creates hazards during a trial, "not because it is logically irrelevant, but it is inherently and unfairly prejudicial. It deflects the jury's attention from the immediate charges and causes it to prejudge a person with a disreputable past, thereby denying that person a fair opportunity to defend against the offense that is charged." *U.S. v. Roark,* 924 F.2d 1426 (8th Cir.1991) (citing *Michelson v. U.S.,* 335 U.S. 469, 476, 69 S.Ct. 213, 93 L.Ed. 168 (1948)). The remarks of the prosecutor here ran a risk that the jury would focus upon the defendant's prior record and conclude, for that reason, he was dangerous. The appellant, however, did not make the connection of the prosecutor's remarks with the evidence of his criminal record and, so, neither do we.

A second reason that the judge may have ruled the remark improper is that it associated White with a crime with which he was not charged, but one for which some on the jury might have great fear—being robbed while using an ATM. The use of the example can be viewed as an appeal to passion and prejudice, a request for the jury to convict because of the kind of person the prosecutor categorized him as being—an ATM robber. That characterization was no more justified than calling him a drug dealer or a hired killer. *Mouzone v. State,* 33 Md.App. 201, 210, 364 A.2d 58 (1976). It would have been just as improper to call him a carjacker if he had been charged with robbing an ATM.

A third reason that the judge may have ruled the remarks improper is that the prosecutor was asking the jurors to use the appellant's appearance to adjudge his guilt. A defendant's fearsome appearance that can alarm or strike fear is beyond what a prosecuting attorney should use in closing

argument.[6] Appellant's physical appearance and the ability of various State witnesses to recognize him was an issue at trial and justified the prosecutor's cross-examining appellant to bring out such matters as his height and weight, and thereby

---

6. We note that neither at the trial nor on appeal did appellant raise the issue that the prosecutor's remarks appealed to racial prejudice, and we do not conclude that the prosecutor, by focusing upon the appellant's appearance, was asking the jurors to invoke racial prejudice. Nevertheless, prosecutors, by remarking about appearance, can unintentionally call or appear to call for disparate treatment because of the defendant's race, a trial tactic that could violate a defendant's constitutional rights. In the context of the facts of this case, the characterization might have been perceived as racial stereotyping, an incendiary issue in today's troubled times. Nothing can be more central to a criminal trial than the right of a defendant to be judged fairly, without racial prejudice, and all involved in the trial of a criminal case should conscientiously work to avoid such appeals. Professor Angela Jordan Davis, in a recent law review article, points out that prosecutors can unconsciously invoke racism:

> [T]oday, with some notable exceptions, most racist behavior is not openly expressed. More significantly, some racist behavior is committed unconsciously, and many who engage in this behavior are well-intentioned people who would be appalled by the notion that they would be seen as behaving in a racist or discriminatory manner.
>
> Unconscious racism, although arguably less offensive than purposeful discrimination, is no less harmful. In fact, in many ways, it is more perilous because it is often unrecognizable to the victim as well as the perpetrator.
>
> \* \* \* \* \* \*
>
> Professor Charles Lawrence defines unconscious racism as the ideas, attitudes, and beliefs developed in American historical and cultural heritage that cause Americans unconsciously to "attach significance to an individual's race and [which] induce negative feelings and opinions about nonwhites." He argues that, although America's historical experience has made racism an integral part of our culture, most people exclude it from their conscious minds because it is rejected as immoral.

Angela J. Davis, *Prosecution & Race: The Power and Privilege of Discretion*, 67 FORDHAM L. REV. 13, 33–34 (1998) (citations omitted).

Justice Antonin Scalia acknowledged the existence of unconscious racism in a memorandum that he wrote to Justice Thurgood Marshall regarding the decision of *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). He wrote, "Since it is my view that the unconscious operation of irrational sympathies and antipathies, including racial, upon jury decisions and (hence) prosecutorial decisions is real, acknowledged in the decisions of this court, and ineradicable, I cannot honestly say that all I need is more proof." (Reprinted in *id.* at 50.)

legitimized his commenting about his physical appearance when arguing to the jury.[7] But associating his appearance with crime is not the harsh commentary upon an accused's **conduct** and **action** that Judge O'Donnell approved in *Wilhelm*, but an argument that ran the risk of calling for the jurors to scorn appellant because of his appearance and to conclude from the way he looks that he belongs to a particular group of feared criminals. For any of several reasons, it was clearly within the trial judge's discretion to sustain the defendant's objection and instruct the jury to disregard the prosecutor's characterization of the defendant.

Appellant's allegation of error is that sustaining the objection and instructing the jury to disregard the prosecutor's characterization of him was insufficient, and that the trial judge should have gone further and admonished the prosecutor in front of the jury and thereby minimize any poisonous effect that the remarks may have had upon the jury. It is not altogether clear that any instruction will "unring the bell" after a prosecutor has put remarks before the jury that severely violate due process, remarks such as those that reveal an inadmissible previous conviction or highlight the failure of the defendant to testify. Supreme Court Justice Brennan, in a case involving a different trial error, commented about the limitations upon jurors' capacity to ignore what they have seen and heard during a trial:

> We agree that there are many circumstances in which this reliance is justified. Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently.... It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, as was recognized in *Jackson v.*

---

7. The prosecutor elicited from appellant that he is a 215–pound, five-foot-eight, stocky African–American with dark or medium complexion and a shaved head.

*Denno,* [ ] there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

*Bruton v. U.S.,* 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (citations omitted).

 When confronting improper argument, the court must take effective action to overcome the likelihood of prejudice. *See Johnson v. State,* 325 Md. 511, 520, 601 A.2d 1093 (1992); *Woodland v. State,* 62 Md.App. 503, 517, 490 A.2d 286 (1985). For some remarks, that action can be informing the jury that the attorney's words were improper, striking the remarks, and instructing the jury to disregard them. *Holbrook,* 6 Md.App. at 270, 250 A.2d 904. In particularly egregious cases, it may include an open court chastising of the offending attorney, a strong, swift, and sure condemnation, a "stern rebuke," in order to assure that the jury is aware that the use of such arguments is out of bounds. *Wilhelm,* 272 Md. at 428, 326 A.2d 707.

 This case is not one in which we can say that the trial judge should have reprimanded the prosecutor in front of the jury. To begin with, the court was in a position to observe the impact of the remarks and determine how much she needed to do in order to minimize whatever harmful effect she believed the remarks had upon the jury. A trial judge's opportunity to hear and observe the closing arguments of trial counsel is much superior to an appellate court's review of a trial transcript. On the basis of the record before us, we will not conclude that the trial judge abused her discretion in failing to go further than sustaining the objection and instructing the jurors to disregard the prosecutor's characterization.

Furthermore, the third consideration for our review, the closeness of the case, as set forth by *Hagez,* 110 Md.App. at 226–27, 676 A.2d 992, also supports our view of the adequacy of the steps the court took to minimize any harm that the prosecutor may have created. In *Johnson v. State,* 325 Md.

511, 601 A.2d 1093 (1992), Judge Orth, writing for the Court, held that the test as to whether improper remarks in closing argument are harmless is the same as that used to determine harmlessness for other errors during a trial, that there is only one standard for measuring error. *Id.* at 521, 601 A.2d 1093. Judge Orth explained that the appellate review of the prosecutor's improper argument asks whether the remarks were a "substantial factor in the conviction" and whether the "verdict would have been different had the improper closing argument not been made." *Id.* at 522, 601 A.2d 1093. We are to ask: Did the prosecutor's remarks, unmitigated by judicial action, have any significant effect upon the jury?

This conviction was not a "close call." The victims, Ms. Conner and Ms. Camphor, were approached by someone whose description closely matched White's appearance and who forcibly stole Ms. Conner's car. It is uncontested that they were the victims of a carjacking. White's defense was that, somehow on that night, at the same time he was in the neighborhood, someone matching his appearance, also wearing dark shorts and a white T-shirt, committed the crime a short distance away from where White was walking and supposedly hitched a ride. According to White, that thief then abandoned the stolen car a short distance away from the Livingston Square Mall where he was discovered. White was asking the jury to believe an amazing coincidence, that is, someone else who looked like him and was dressed like him was in need of a car at the same time in the same neighborhood and that person stole the car and abandoned it close to where he was discovered in a dumpster. His explanation for being in a dumpster at the mall was that he had been placed there by unknown attackers motivated by some unexplained purpose. Instead of making his story more believable, his testimony makes it less so. The evidence in this case was overwhelmingly convincing of guilt. This is one in which we can say, beyond any reasonable doubt, that had the prosecutor not used the remarks that the appellant objected to, and, instead, had simply recounted the evidence and thanked the jurors for their service, the verdict would have been the same—guilty on

all the counts except kidnapping, which the prosecutor confessed was a "close call." In passing judgment on the "closeness" of the case, we find that it was not close at all, and weighing the lack of closeness with the possible damage that the prosecutor's remark may have caused, we hold that the trial judge was correct in not granting appellant's request to admonish the prosecutor.

In affirming the conviction, we do not condone the prosecutor's *ad hominem* comments. The State's license to strike hard blows in the trial of a criminal case should not be interpreted as license to use the respect that the representative of the State may enjoy with the jurors and combine that respect with an appeal in closing argument to the community's possible passions and prejudices. From time to time, appellate courts are unable to find error in what wisdom condemns. What Judge Davis said in a previous decision for this Court bears repeating: "[T]he better practice would be to characterize a defendant's actions rather than to engage in name calling[,]" and, further, that prosecutors should "refer to the **actions** of a defendant rather than resort to epithets, thereby avoiding the unnecessary risk of overturning any conviction obtained." *Walker v. State,* 121 Md.App. 364, 382, 709 A.2d 177, *cert. denied,* 351 Md. 5, 715 A.2d 964(1998) (emphasis in original).

**JUDGMENTS AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**

MOYLAN, Judge, concurring.

I concur in the decision of the Court to affirm the convictions in this case. I concur, moreover, in the holding of the Court that the trial judge correctly declined to give the appellant's requested jury instruction on the subject of character evidence and in that part of the opinion explaining that holding. I also concur in the holding of the Court that the trial judge committed no error with respect to closing argument.

The reason I file a separate concurrence is to dissociate myself from what I believe to be a totally unnecessary and ill-advised discussion, all by way of *dicta*, with respect to the prosecutor's closing argument. In my judgment, there was nothing remotely improper about the closing argument given by the prosecuting attorney. I think it a clear mistake for this Court, even by way of *dicta*, to suggest that the argument was in any way less than legitimate. Closing argument is intended to be a robust forum where skilled advocates "slug it out" with all of the forensic weapons at their disposal. If appellate courts begin second-guessing this aspect of the adversary process too fastidiously, they will open a Pandora's Box with unimaginable consequences. We will end up being called upon to "blue pencil" every successful argument that is made.

I reemphasize that the remarks in the majority opinion are only gratuitous *dicta* and I hope that whenever they are quoted, as inevitably they will be, the State hastens to point out their less-than-authoritative status.